STATE OF NORTH DAKOTA EX REL. T. F. McCUE, Attorney General, v. NORTHERN PACIFIC RAILWAY COMPANY and Great Northern Railway Company and Minneapolis, St. Paul, & Sault Ste. Marie Railway Company.

(145 N. W. 135.)

Three separate actions against the above-named defendants severally were consolidated as to proof, and are decided by this opinion. These actions were begun by the state to compel observance by defendants of chapter 51 of the Session Laws of 1907, prescribing a maximum intrastate freight rate for transportation of lignite coal, and requiring that when a shipment is over more than one railroad, the entire distance shall be considered as one haul and the freight rate prorated between said carriers.

The granting of the writs compelling observance of the statutory rate was opposed under the defense that the statute was void because so low as to be confiscatory of the property of the carriers, and hence violative of the 14th Amendment to the Federal Constitution. This contention was overruled by this court in the opinion at 19 N. D. 45, filed in 1909, and writs as asked by the state were ordered to issue. The defendants appealed to the United States Supreme Court, which affirmed said decision without prejudice, but granted defendants permission to "reopen the case by appropriate proceedings, if, after adequate trial" with the rates in force, they should see fit to again present the results under the rates as proof of the confiscatory character of the statutory coal rate. The statutory rate was put in effect, and the railroads are still operating under it. In 1912 they again submitted proof to this court of the receipts for the fiscal year next preceding June 30, 1911, together with proof of expenses chargeable against the lignite coal traffic. Each road has submitted its separate proof and contention that the statutory rate does not yield sufficient revenue to defray the expenses of carriage of this coal, to the effect that the state is compelling its common carriers to transport this commodity for less than cost, and therefore confiscating their property. The proof was taken,

Note.—The authorities on the question of the valuation upon which return or income from intrastate railway rates prescribed by law is to be computed are collated in a note in 57 L. ed. U. S. 1511.

As to the reasonableness of state limitation of railroad rates, see note in 44 L. ed. U. S. 417. And for the elements entering into determination of reasonableness of railroad rates prescribed by the state for local traffic, see notes in 15 L.R.A.(N.S.) 108, and 25 L.R.A.(N.S.) 1001. And on the question of unconstitutional inequality or discrimination in state regulation of rates, see note in 46 L. ed. U. S. 92.

as in the original proceedings before this court, by a referee, who has reported all the testimony offered, but who was not authorized to make, and who has not made, findings of fact or conclusions of law.   This court has made separate and full findings of fact, under the proof submitted, as to the effect of the rate upon each road.   It finds:   (1) That, as to the Great Northern Railway Company, owing to conditions peculiar to the country traversed by it, the statutory rate yields it a reasonably fair compensation over and above all charges and expenses against the lignite traffic, and that as to it the statutory rate is reasonably compensatory.   (2) That, as to the Northern Pacific Railway Company, out of total freight receipts for lignite coal, amounting to $58,953, the total cost of transportation, or out-of-pocket costs, together with all fixed or overhead expenses apportionable to said lignite traffic, consumed all of said receipts excepting $847, its net profit in the handling of the lignite business for the twelve months in question.   That such rate is slightly remunerative, but in fact noncompensatory, considering the volume of freight carried and the property of the railroad devoted thereto.   (3) That the total Soo line freight receipts from lignite coal hauled during said fiscal year amounted to $83,670. That nearly one half of its entire lignite coal tonnage originated at Wilton, 2,532 carloads of which were hauled only 28 miles to Bismarck and delivered to the Northern Pacific carrier for an average haul by it of 105 miles, upon which the freight rate when prorated as to distance, as required by the statute, has reduced what the Soo carrier would otherwise receive under the statute from 40 cents per ton to 24.5 cents per ton for the 2,532 carloads thus delivered to the Northern Pacific during the year.   Under similar connections with the Great Northern at Minot, it has there hauled approximately 500 carloads of lignite coal for an average of 12 miles, realizing therefrom 8.5 cents per ton only, or $1.83 per carload for such haul, delivered to the Great Northern road for an average haul and charge based thereon of 65 miles, from which the Great Northern received $7.53 per carload.   These and many other conditions have placed the Soo line at a disadvantage in this traffic.   The prorating feature of the statute alone has reduced its freight·receipts on lignite approximately $13,000 below what it otherwise would have received, and nearly that amount under what the same freight carriage would have yielded the Northern Pacific or the Great Northern under usual conditions on their lines.   Its total receipts amount to more than its actual out-of-pocket costs, or actual costs of transportation, but are from $9,000 to $12,000 less than the total costs including fixed and overhead expenses properly chargeable to the carriage of this commodity and against the earnings therefrom.   That the carriage of lignite coal by the Soo line within this state during said fiscal year was not only nonprofitable, but occasioned a loss to it when its fixed expenses apportionable to all traffic are in proper proportion and amount assigned to and charged against the earnings from this commodity.

From the foregoing epitomized findings of fact it is held:

**Freight rate — presumed reasonable — contrary must be shown beyond reasonable doubt.**

(a) The statutory freight rate is presumed to be reasonable, which presumption continues until the contrary appears, and the rate is shown beyond a reasonable doubt to be confiscatory.

**Proof — noncompensatory rate — transportation of commodity — insufficiency of proof that rate is confiscatory.**

(b) Proof that a rate is noncompensatory—that is, while producing more revenue than sufficient to pay the actual expenses occasioned by the transportation of the commodity, but insufficient to also reimburse for that proportion of the railroad's fixed or overhead costs properly apportionable to such commodity carried—is not sufficient to establish that the rate is confiscatory in law.

**Nonconfiscatory rate — established how — deficit — interstate freight earnings — profit — reasonable — railroad property — value of.**

(c) In order to establish such a noncompensatory rate to be confiscatory, it must further appear that any deficit under the rate affects the net intrastate freight earnings materially, and reduces them to a point where they are insufficient to amount to a reasonable rate of profit on the amount of the value of the railroad property within the state contributing to produce such net earnings.

**Intrastate freight earnings — confiscatory — value of property devoted to such traffic — proportion.**

(d) To ascertain whether such net intrastate freight earnings are thus confiscatory because unreasonably low, the railroad attacking the legislative rate on such grounds must by proof establish the total value of its property devoted to railroad use and within the state, and then by proof establish the proportion thereof equitably apportionable as producing such net intrastate or domestic freight earnings, after which the reasonableness of the gross net return from intrastate business upon the railroad investment producing it can be determined.

**Proof of confiscation — intrastate freight earnings — fair profit — valuation of property so used.**

(e) For the next and final step in the proof of confiscation under the rate, it must further appear either (1) that the net total intrastate freight earnings are insufficient to yield a fair and reasonable return on the fair valuation of the railroad property used to produce such net earnings, and that the commodity in question is carried for less than sufficient to meet all expenses, including out-of-pocket costs and fixed charges; or (2) it must be reasonably certain that the loss on the commodity under the commodity rate attacked reduces the balance of the net intrastate freight earnings to a point where such total net intrastate earnings, including the loss on the commodity

rate, fail to yield a fair and reasonable return on the investment, measured under the above rules, upon making of which proof the confiscatory nature of the rate is established.

**Value of railroad property — fair actual value — reasonableness of rates — computed on actual value.**

(f) In determining the value of railroad properties, proof of the so-called railroad value is insufficient to establish the fair actual value upon which, as a basis, apportionment of values and reasonableness of rates may be computed.

**Failure of such proof — value — proportion of property used in such traffic.**

(g) Measured by the foregoing rules, which seem to be the law as applicable to the facts in this case, there is a failure of proof on the part of all the carrier defendants, in that the Northern Pacific and Great Northern railroads have offered no proof of the value of their property, or the approximate proportion thereof utilized to produce its domestic earnings; and the Soo, while attempting such proof, has failed to make the proof required by the Minnesota, Missouri, Arkansas, and Oregon Rate Cases, 230 U. S. 352–560, and other Federal decisions.

**Failure of proof — presumption — reasonableness of rate — continues — statute valid — intrastate transportation of coal.**

(h) Under such failure of proof the presumption of reasonableness of the rate attacked continues, and the statute must be held to prescribe a reasonable charge for the intrastate transportation of coal.

Opinion filed January 2, 1914.

Proceedings on application on behalf of the State for an original writ directing the observance of the freight rates in question, and enjoining the collection of higher than the maximum statutory rate.

Writs granted. Costs and disbursements of State ordered taxed by the Clerk.

*Andrew Miller, C. L. Young, Alfred Zuger,* for plaintiff.

The opinions of railway officials are not proper evidence. They are too hazy and indefinite to receive serious consideration. Interstate Commerce Commission v. Union P. R. Co. 222 U. S. 548, 56 L. ed. 312, 32 Sup. Ct. Rep. 108; Ames v. Union P. R. Co. 64 Fed. 188; F. Schumacher Mill. Co. v. Chicago, R. I. & P. R. R. Co. 6 Inters. Com. Rep. 66.

The principle that the compensation should bear a reasonable relation to the risk and responsibility assumed is the settled rule of the common law. Kansas City Southern R. Co. v. Carl, 227 U. S. 639,

57 L. ed. 683, 33 Sup. Ct. Rep. 391; 2 Wyman, Pub. Service Corp. § 1232; Beale & W. R. Rate Regulation, § 554.

Brief consideration of the characteristics of lignite coal will show the injustice of allotting to it a cost determined without regard to such characteristics. The expense of handling it is low. The carrier neither loads nor unloads the cars. The *rate* should be fixed in the light of these facts. Tift v. Southern R. Co. 10 Inters. Com. Rep. 548, 138 Fed. 764; Louisville, E. & St. L. Consol. R. Co. v. Wilson, 132 Ind. 517, 18 L.R.A. 105, 32 N. E. 311; Trades League v. Philadelphia, W. & B. R. Co. 8 Inters. Com. Rep. 368; American Cent. Ins. Co. v. Chicago & A. R. Co. 74 Mo. App. 89; Hays v. Pennsylvania Co. 12 Fed. 309; 2 Wyman, Pub. Service Corp. § 1348; Denison Light & P. Co. v. Missouri, K. & T. R. Co. 10 Inters. Com. Rep. 337; F. Schumacher Mill. Co. v. Chicago, R. I. & P. R. Co. 6 Inters. Com. Rep. 66; Coxe Bros. & Co. v. Lehigh Valley R. Co. 3 Inters. Com. Rep. 460, 4 I. C. C. Rep. 535; Interstate Commerce Commission v. Chicago, G. W. R. Co. 141 Fed. 1015; Re Advances on Coal, 22 Inters. Com. Rep. 604.

Circumstances may exist under which rates are reasonable which do not afford a net income above the cost of operation and taxes, or the cost of operation, taxes, and fixed charges. State ex rel. State R. Comrs. v. Seaboard Air Line R. Co. 48 Fla. 129, 37 So. 314; St. Louis & S. F. R. Co. v. Gill, 156 U. S. 649, 39 L. ed. 567, 15 Sup. Ct. Rep. 484; Minneapolis & St. L. R. Co. v. Minnesota, 186 U. S. 257, 46 L. ed. 1151, 22 Sup. Ct. Rep. 900; Wyman, Pub. Service Corp. § 1201; 3 Enc. U. S. Sup. Ct. Rep. 632; Freund, Pol. Power, § 551; Interstate Consol. Street R. Co. v. Massachusetts, 207 U. S. 79, 52 L. ed. 115, 28 Sup. Ct. Rep. 26, 12 Ann. Cas. 555; Willcox v. Consolidated Gas Co. 212 U. S. 19, 52, 53 L. ed. 382, 400, 48 L.R.A.(N.S.) 1134, 29 Sup. Ct. Rep. 192, 15 Ann. Cas. 1034; Atlantic Coast Line R. Co. v. North Carolina Corp. Commission, 206 U. S. 1, 51 L. ed. 933, 27 Sup. Ct. Rep. 585, 11 Ann. Cas. 398.

To determine whether rates are confiscatory or not, all sources of revenue must be considered. Minneapolis & St. L. R. Co. v. Minnesota, 186 U. S. 257, 46 L. ed. 1151, 22 Sup. Ct. Rep. 900; Atlantic Coast Line R. Co. v. North Carolina Corp. Commission, 206 U. S. 1, 51 L. ed. 933, 27 Sup. Ct. Rep. 585, 11 Ann. Cas. 398; State ex rel. State R. Comrs. v. Seaboard Air Line R. Co. 48 Fla. 129, 37 So. 314.

If the *net* earnings from *all sources* are *compensatory,* this is sufficient, and a given rate on a certain commodity cannot be said to be confiscatory. Matthews v. Corporation Comrs. 106 Fed. 10; Southern R. Co. v. McNeill, 155 Fed. 787; Re Arkansas Rate Cases, 187 Fed. 307; Interstate Commerce Commission v. Union P. R. Co. 222 U. S. 541, 549, 56 L. ed. 308, 312, 32 Sup. Ct. Rep. 108; Atlantic Coast Line R. Co. v. North Carolina Corp. Commission, 206 U. S. 1, 51 L. ed. 933, 27 Sup. Ct. Rep. 585, 11 Ann. Cas. 398; Seaboard Air Line R. Co. v. Florida, 203 U. S. 269, 51 L. ed. 178, 27 Sup. Ct. Rep. 108; Covington & L. Turnp. Road Co. v. Sandford, 164 U. S. 596, 41 L. ed. 566, 17 Sup. Ct. Rep. 198; Smyth v. Ames, 169 U. S. 467, 42 L. ed. 819, 18 Sup. Ct. Rep. 418; Munn v. Illinois, 94 U. S. 113, 24 L. ed. 77; People v. Budd, 117 N. Y. 1, 5 L.R.A. 559, 22 N. E. 670.

The power of states to regulate within their limits matters of internal police includes, under that general designation, whatever will promote the peace, comfort, convenience, and prosperity of the people, and is not limited to health, morals, or safety of the public. Escanaba & L. M. Transp. Co. v. Chicago, 107 U. S. 678, 27 L. ed. 442, 2 Sup. Ct. Rep. 185; Lake Shore & M. S. R. Co. v. Ohio, 173 U. S. 297, 43 L. ed. 706, 19 Sup. Ct. Rep. 465; Noble State Bank v. Haskell, 219 U. S. 112, 55 L. ed. 117, 32 L.R.A.(N.S.) 1062, 31 Sup. Ct. Rep. 186, Ann. Cas. 1912A, 487; Camfield v. United States, 167 U. S. 518, 42 L. ed. 260, 17 Sup. Ct. Rep. 864; Gladson v. Minnesota, 166 U. S. 427–430; 41 L. ed. 1064, 1065, 17 Sup. Ct. Rep. 627; Wisconsin, M. & P. R. Co. v. Jacobson, 179 U. S. 287, 45 L. ed. 194, 21 Sup. Ct. Rep. 115; Atlantic Coast Line R. Co. v. North Carolina Corp. Commission, 206 U. S. 1, 51 L. ed. 933, 27 Sup. Ct. Rep. 585, 11 Ann. Cas. 398.

In the proper application and enforcement of these losses for the general welfare of the whole people, relatively small individual losses may occur. But this is not an argument against such law. Martin v. District of Columbia, 205 U. S. 135, 139, 51 L..ed. 743, 744, 27 Sup. Ct. Rep. 440; Camfield v. United States, 167 U. S. 518, 524, 42 L. ed. 260, 262, 17 Sup. Ct. Rep. 864; American Sugar Ref. Co. v. Louisiana, 179 U. S. 89, 92, 95, 45 L. ed. 102, 103, 105, 21 Sup. Ct. Rep. 43; Williams v. Fears, 179 U. S. 270, 276, 45 L. ed. 186, 189, 21 Sup. Ct. Rep. 128; W. W. Cargill Co. v. Minnesota, 180 U. S. 452,

469, 45 L. ed. 619, 627, 21 Sup. Ct. Rep. 423; Quong Wing v. Kirkendall, 223 U. S. 62, 56 L. ed. 351, 32 Sup. Ct. Rep. 192; Cobb v. Northern P. R. Co. 20 Inters. Com. Rep. 100; Great Northern R. Co. v. Chicago, M. & St. P. R. Co. 5 I. C. C. Rep. 571.

The burden of proving that the constitutional guaranty of protection to property is infringed is upon the defendant. Chicago, M. & St. P. R. Co. v. Tompkins, 176 U. S. 173, 44 L. ed. 420, 20 Sup. Ct. Rep. 336; Re Arkansas Rate Cases, 187 Fed. 290; Chicago & G. T. R. Co. v. Wellman, 143 U. S. 339, 344, 36 L. ed. 176, 179, 12 Sup. Ct. Rep. 400; Reagan v. Farmers' Loan & T. Co. 154 U. S. 362, 399, 38 L. ed. 1014, 1024, 4 Inters. Com. Rep. 560, 14 Sup. Ct. Rep. 1047; Smyth v. Ames, 169 U. S. 467, 42 L. ed. 819, 18 Sup. Ct. Rep. 418; Henderson Bridge Co. v. Henderson, 173 U. S. 592, 614, 615, 43 L. ed. 823, 831, 19 Sup. Ct. Rep. 553.

It is the settled doctrine that if a railroad, as an entirety, does a business that is compensatory, it has no legal right to complain that an act of the legislature may deprive it of revenue over a portion of its line, or injuriously affect its business as to a part thereof. St. Louis & S. F. R. Co. v. Gill, 156 U. S. 649, 39 L. ed. 567, 15 Sup. Ct. Rep. 484; People ex rel. Cantrell v. St. Louis, A. & T. H. R. Co. 176 Ill. 512, 35 L.R.A. 656, 52 N. E. 292.

*Watson & Young* (*Charles W. Bunn* and *Charles Donnelly,* of counsel), for Northern Pacific Railway Company.

In determining the reasonableness of a rate, if the entire intrastate business is to be taken as a basis of reasoning, why not take the business of the company *in all states?* Smyth v. Ames, 169 U. S. 540–543, 42 L. ed. 847, 848, 18 Sup. Ct. Rep. 418.

The Supreme Court of the United States never meant to affirm any such holding. If it had so intended, no leave would have been granted to improve the character of the proof. Interstate Commerce Commission. v. Union P. R. Co. 222 U. S. 541, 549, 56 L. ed. 308, 312, 32 Sup. Ct. Rep. 108; St. Louis & S. F. R. Co. v. Gill, 156 U. S. 649, 39 L. ed. 567, 15 Sup. Ct. Rep. 484; Atlantic Coast Line R. Co. v. North Carolina Corp. Commission, 206 U. S. 1, 25, 26, 51 L. ed. 933, 944, 945, 27 Sup. Ct. Rep. 585, 11 Ann. Cas. 398; Missouri, K. & T. R. Co. v. Interstate Commerce Commission, 164 Fed. 645.

*A. H. Bright, John L. Erdall,* and *Cobb, Wheelwright, & Dille,* for the Minneapolis, St. Paul & Sault Ste. Marie Railway Company.

*E. C. Lindley, Sanford H. E. Freund* and *C. J. Murphy,* for Great Northern Railway Company.

Goss, J.   Three separate actions are decided by this one opinion. Each was begun by the state of North Dakota, ex rel. attorney general, against the common carriers involved, the Northern Pacific, Minneapolis, St. Paul, & Sault Ste. Marie, and Great Northern Railway Companies.   In 1907, Attorney General McCue petitioned this court for its prerogative writ of injunction to restrain the defendants from further noncompliance with chapter 51 of the Session Laws of 1907, that had been in effect since July 1st of that year, and had been ignored by these common carriers.   On hearing the writs were issued as prayed for.   See opinion of this court, 19 N. D. 45, 25 L.R.A.(N.S.) 1001, 120 N. W. 869.   The railroads appealed to the United States Supreme Court, where the cases were affirmed in 216 U. S. 579, 54 L. ed. 624, 30 Sup. Ct. Rep. 423, without prejudice, but permission was granted the carriers to reopen the cases after the rates had been put in force for a sufficient time so that a test of the reasonableness of the rate attacked could be had from the results of operating under the rate, and, accordingly, the carriers have reopened the cases, after the rate had been put in effect for over a year, and they have offered testimony touching the reasonableness of the maximum statutory rate, contending it to be so low as to be confiscatory of their property, and void under the 14th Amendment to the United States Constitution.   The cases were tried as one action under the stipulation that any evidence in the case might be considered as proof as to any or all of the defendants. Each carrier, however, has submitted its proof following its own theory.

Separate findings are made as to each carrier.   Instead of formulating the usual ultimate findings of fact, we have made them evidentiary as well.   This that our position, and conclusions may be fully understood on facts as well as law, and also as an aid to the United States Supreme Court, so far as the determination of the facts is concerned, assuming, of course, that this case will again reach that tribunal for final determination.   As requested by counsel, we have made our

findings so full and complete that we trust, if an appeal is taken, the review·may be had almost, if not entirely, upon the facts found.    We may here state that we believe the prorating feature of chap. 51 of the Session Laws of 1907, to be the particularly objectionable feature of that legislation, and that the same works injustice to the Soo line; and if we were to pass judgment on the merit of the measure, we would unhesitatingly say that at least the last paragraph of the statute in question·should be repealed or amended to omit the prorating feature thereof, governing the rate of coal shipments between connecting carriers where the shipment is over the line of more than one carrier.    This, however, is beside the case.

Statement of Facts as to the Northern Pacific Railway Company.

The total revenue received by the Northern Pacific Railway Company from the commodity in question, lignite coal, for the entire fiscal year, or twelve months prior to June 30, 1911, was $58,953.07, as shown by the freight receipts of the company for that period.    To ascertain the amount of expense incurred and properly chargeable against this particular commodity, in the earning of such gross revenue, by the carriage of that commodity, is the question of fact.

As a result of the painstaking work of the accounting department of this railway company, and its endeavors to render all the assistance possible in determining the matter of the apportionment of expense to this commodity, as is evidenced by the care and detail in the accounting, the information furnished by the exhibits, and that the books of the company have been thrown open to the experts of the state, we are enabled to arrive, with a reasonable degree of certainty, at the proper proportion of expense that should be chargeable against the revenue received from the carriage of this commodity.

From the statistics furnished we may ascertain such result by either of two methods, or by a combination of both.    We refer to the division of expense as summarized under seven divisions, as calculated· by the railway company, know as the railway method, or as divided into the 114 separate items of expense, classified into five grand divisions, under the method of the state's expert accountant, Mr. C. W. Hillman.    To

contrast the two, the railroad has classified the expense into seven general items, as shown by N. P. Exhibit 24, as follows:

| | |
|---|---:|
| Train operation expense | $ 31,146.77 |
| Switching | 4,971.00 |
| Station service | 4,182.58 |
| Repairs to freight cars | 8,674.04 |
| Maintenance of way and structures | 7,119.93 |
| Loss and damage, traffic, and general expenses | 2,688.26 |
| Total operating expenses | $ 58,782.57 |

Taxes 4.112 per cent of revenue, $58,953.07, $2,424.15, making a total charge of $61,206.72 in earning the freight revenue from the commodity of $58,953.07, leaving a deficit according to the railroad figures of $2,253.65, upon which they urge tne rate fixed by legislative enactment to be confiscatory, and therefore unconstitutional.

On the other hand, according to the method used by the state's expert, Mr. Hillman, there would appear to be a net profit over all expenses and taxes of $1,493.71, which is further increased by claims made by the state on page 20 of the brief, that a net profit of $2,391.63 is shown from the lignite traffic over and above total operation expenses inclusive of taxes. Of the seven classifications of expense under the railway method, two of them, that is, taxes in the sum of $2,424.15, and maintenance of way and structures at $7,119.93 (see page 18 of plaintiff's brief), are conceded by the state to be properly chargeable against the revenue from this commodity. The other charges are questioned, the state maintaining that train operation expenses should be charged at $30,611.38, instead of $31,146.76, a difference of $535.38; for switching, the state contends that the charge should be $4,611.25 on a total of 18,455 car movements chargeable to lignite traffic (see page 14 plaintiff's brief), instead of a charge based on 19,884 car movements, amounting to $4,971.00, or a difference of $359.75. As to the third subdivision, that of station service, the state, at pages 14 and 15 of its brief, contends the 4,412 cars of lignite receiving services should be charged for at 36 cents per service received per car, each car concededly receiv-

ing double service, that is, on a basis of service to 8,824 cars at 36 cents, instead of at 47.4 cents per car for station service, or an apportionment as contended for by the state of $3,176.64 for station service to lignite traffic, instead of $4,182.58 as allowed therefor by the company, or a difference of $1,005.94. The fourth item of repairs, renewals, and depreciation of freight cars is charged to the lignite traffic by the railway company at $8,674.04, the proper charge for which is contended by the state (pages 17 and 18 of its brief) to be $7,121.54, a difference of $1,552.50. The one remaining disputed item is that including three general items, namely, loss and damage, traffic expenses, and general expenses, which the railroad in this accounting has apportioned on a revenue proportion of 4.56 per cent of gross earnings, which, when applied to $58,953.07, produces a charge made against the lignite traffic of $2,688.26. In such apportionment there is included, as the amount allowed for loss and damage charged to lignite freight, the sum of $1,232.40. The state contends that this item of loss and damage, in amount $1,232.40, is not chargeable to this traffic. We will now consider each classification in which the apportionment thereto of expense is disputed.

## Train Operation Expense.

This involves a computation from classification of freight with reference to (1) relative cost to all other freight of transportation of lignite; (2) the average tonnage per car; (3) the average haul; (4) the train movement, whether (a) main line through service, (b) main line way service, or (c) branch line service; in the consideration of all of which enters the proportion of empty car mileage to loaded car mileage. The computation which will take into account all the foregoing factors and yield the proportionate share of expense to be borne by this commodity as apportioned to the whole traffic is, by the use of equated ton, car, and train mileage, producing a relative cost from which, from known factors, the cost per ton mile of lignite coal can be determined, as tables in evidence show the manner of its carriage as to through, way, and branch line freight, the number of cars handled, where received and where delivered, the mileage and tonnage of each, the relative train loads and the empty car haul charged against the

traffic, as well as the exact amount of wages paid and cost of fuel and supplies in all freight movement within the state.

From N. P. Exhibit 18, for the fiscal year ending June 30, 1911, a summary of previous exhibits, we ascertain that 4,412 carloads of lignite coal, containing 118,550 tons of coal, were hauled an average of 79.13 miles, amounting to the equivalent of hauling 1 ton of coal 9,380,678 miles, or that number of ton miles, for which it was paid the total revenue of $58,953.07, which computed per car of approximately 27.1 tons gave $13.36 freight per car, or 6.28 mills as the average freight rate per ton mile, for carriage of lignite coal.

We then ascertain from N. P. Exhibit 19 that during said fiscal year there was moved within the state of North Dakota 3,081,552 tons of freight for an average haul of 227.7 miles, the equivalent of 701,732,-022 tons moved 1 mile, or ton miles, yielding a total revenue, collected in this state, of $6,368,277.67. But this freight movement is divided into three classes, viz., (1) Through freight, which constituted 63.5 per cent of the entire tonnage; (2) freight originating in or terminating within the state, constituting 32.7 of the entire tonnage; (3) freight entirely local to the state, which constituted 3.8 per cent of the entire tonnage; from which tonnage, at approximately $19\frac{1}{4}$ tons per car, for all freight, we find 36,450,279 loaded cars have been moved 1 mile. To produce every 100 miles of load as for all traffic, the average shows the additional necessary movement of an empty car 18.43 miles, and to produce the total loaded car miles, we find in addition an empty car mileage of 6,717,556, making a total car movement, loaded and empty, the equivalent of 43,168,035 car miles, of which lignite coal amounted to 346,201 loaded car miles, with 71.42 per cent thereof, or 247,261 miles, to be added for empty car mileage necessary in moving said loaded car mileage.

Considering now the relative expense incident to the movement of a ton of coal, as compared with the movement of the average ton of all freight, taking into account the fact that the average car of lignite contains approximately 27.1 tons, while the average car of all freight handled contains but approximately 19 tons, we find that this difference is equalized by the fact that for every 100 loaded car miles there is an empty car haul chargeable against the lignite freight of approximately 72 per cent, or 72 miles, while as to all freight the average

26 N. D.—29.

empty car haul is approximately 18 per cent only, which reduced to tonnage per mile haul, on a basis of 100 miles, gives the proportion approximately of 202 to 198. Or, in other words, that it takes 202 gross ton miles to produce 100 miles of live or revenue haul in the transportation of lignite as to 198 gross ton miles to produce 100 revenue ton miles of other freight, demonstrating that there is practically little difference between the cost of hauling 1 ton of lignite coal and the cost of hauling the average ton of all freight in the same class of train service, and that therefore the relative cost of transportation of lignite coal to the cost of other freight depends upon the class of train service furnished, that is, whether the commodity is carried as (1) main line through freight, (2) main line way freight, or (3) branch line freight.

We may here properly comment upon the large proportion of empty to loaded car miles in the lignite traffic. The above percentage of approximately 72 per cent is that given by the railway company as the computation from the actual miles of empty car haul computed as to each car, as appears from tables in evidence and from the testimony of the accountants. Thus, it would seem that each car hauling lignite is charged with an empty mileage of more than one half of one freight division. At first glance it would appear that each car was charged with approximately 175 miles empty car haul, in view of the fact that, as shown by Table 6 of N. P. Exhibit 21, 2,532 of the 4,412 cars hauling lignite were received loaded by this carrier from the Soo line at Bismarck; but we assume that for each one of these 2,532 cars so received necessarily an empty return trip for a great portion of the entire loaded distance, or the percentage of nearly 100 of the loaded distance, is charged for empty mileage, as necessarily all Soo freight cars must be returned to Bismarck for delivery to the Soo road. This probably increased rather than diminished the empty car haul properly chargeable. In this connection, too, no empty car mileage without the state has been added in charging the empty car mileage from the place where the car had last delivered its load back to the mine, because the total return trips of the empty cars received from the Soo at Bismarck, figured as empty for 100 per cent of the loaded haul for such cars alone, amount to 265,394 car miles of empty haul, or

18,133 miles more than is charged for all empty haul.   See N. P. Exhibit 18.

For comparison we here state that the empty car mileage of the Soo amounts to approximately 20 per cent more than that figured as the empty car mileage of the Northern Pacific, but the average loaded car haul of the Soo is but 41.76 miles (plaintiff's Soo Exhibit 1C) as against an average of 80 miles for the Northern Pacific.   The Great Northern road, which makes no charge until the empty car reaches the division upon which it is to be used, has an empty car mileage of 30.9 per cent to a loaded car mileage of 69.1; figured on total car miles empty and loaded of 100 per cent, or figured on a basis of empty to loaded car haul, with a basis of 100 for the loaded car haul, the empty car mileage would be about 43 per cent of the loaded car haul, and with an average loaded car haul for lignite coal of 63 miles.   This difference in the empty car haul between the Great Northern and the other two roads is due in the main to different conditions prevailing along its road, rather than due to any difference in system of computing empty car mileage against the lignite traffic.   We take judicial notice that the population along the Great Northern lignite market would average three times as dense as along the Northern Pacific or Soo lines. Accordingly, the Great Northern has the advantage in freight consumed, leaving more empty cars ready for local loading.   Besides, eastern coal is used on the Great Northern in greater proportion than in the Northern Pacific or Soo lignite territory, leaving empty coal cars for use. The same is true as to lumber shipments.   We conclude the difference in empty car mileage is actual, and arises from conditions favoring the traffic in such respect on the Great Northern.

Having shown, then, that the empty car haul overcomes the advantage in favor of lignite coal arising from the half greater load in tons per lignite car than average freight, so that lignite is carried on an average relative cost per ton on an equality with all other kinds of freight, leaving out the question of the kind of train on which the same is carried, we now consider the effect of the train service rendered to lignite upon the cost, compared to the average cost of service to all other freight.   And to determine this, reference is had to N. P. Exhibit 20, showing the comparative cost of transporting freight in main

line way, main line through, and branch line freight trains, also operating expenses within or touching North Dakota for train service and engine service expenses, including repairs of engines, wages of trainmen, fuel, and all supplies used in such transportation. Consulting said table we find an entire mileage within the state for the months of November, 1910, and April, 1911, conceded by all parties to be representative months reflecting a fair average of traffic conditions for the year, of, for main line through freight, 182,694, train miles conducted at an actual computed (not estimated) cost of $139,831.74, or at an average cost per train mile of 76.5 cents, which reduced to ton miles by multiplying the train mileage by the average gross train load in tons, 1,476, produces 259,787,614 tons as carried 1 mile, on ton miles, of main line through freight, yielding the result of a carriage of 100 tons 1 mile for an actual cost of 5.18 cents.

Treating main line way freight in the same manner, and from the same table, we find 38,910 train miles carried for $35,982.94, or an average cost per train mile of 92.5 cents. But the average load per main line way freight is but 669 tons as compared with 1,476 tons of main line through freight. So that the ton miles produced by multiplying the train miles by the average train load of 669 tons produces but 25,313,590 ton miles, or tons carried 1 mile, at an average actual cost per 100 ton miles of 13.83 cents.

Treating branch line freight in the same manner, and from the same exhibit, we ascertain a train mileage of 72,143 was conducted at an expense of $45,129.62, or an average actual cost per train mile of 62.6 cents. But here again the average tonnage is much less than the main line through, it being but 404 tons per branch freight line train as against 1,476 of main line through, and 669 of main line way freight, which produces an actual cost for carriage of 100 tons 1 mile, or 100 ton miles, of 15.5 cents on branch line freight service.

The actual cost per 100 ton miles having been found at 5.18, 13.83, and 15.50 cents respectively, of the three classes of service, we find they compare as follows, using 100 per cent as the cost of main line through freight, viz., 100 for main line freight, 266 for main line way freight, and 299 for branch line freight; and that the relation in loads as to ton miles between main line through and main line way freight is as 1,476 tons is to 669 tons, or as 221 is to 100. The foregoing is

without reference to lignite traffic, but merely to obtain the equated expense and relation between all freight.

It is in the application of the foregoing figures to the actual car mile-age of lignite freight, classified with reference to main line through, main line way, and branch line freight, that the difference arises between the state and the defendant company. The latter had taken the proportions arrived at as to all freight for the representative months of November and April and applied the same to the entire haul of lignite for the entire fifteen months, using in the application the actual car mileage of lignite for said entire period. It produces the following figures: For main line through actual car miles 132,346, at a relative cost of 100 equals an equated car mileage of 132,346 main line way actual car miles 192,246 at a relative cost of 267 as compared with main line through yields in equated car miles 513,297. In branch line actual car mileage, 39,892, at a relative proportion of 299 to main line through, yields 119,277 in equated miles, all equated as on the proportion of main line through freight. Totaling we find the actual car miles, 364,484, when equated, to yield a total of 764,920 equated car miles, which amounts to 210 per cent of the actual total car mileage. All of which, being the actual and equated mileage in the transportation of lignite coal for the fifteen-months period, is the equivalent of saying that the transportation of lignite costs 210 per cent of the equated ton mile cost of all freight.

Turning now to the third subdivision of Northern Pacific Exhibit 22, we find the actual ton mile of all freight moved in North Dakota during the fiscal year in question (see page 206 abs., state's witness Johnson's testimony) to be 701,732,022 ton miles, of which, as appears from N. P. Exhibit 20, 91.121 per cent of 635,843,835 tons carried on the main line at a relative cost of 1 or 100 per cent equals 579,387,280 as the equated revenue ton miles; and of said total actual ton mileage on the main line, 8.879 per cent was carried on main line way trains at a relative cost of 267 per cent of the cost of main line through trains, or 267 times 56,456,575 tons of main line way freight actually carried, equaling 150,739,055 equated revenue ton miles on the basis of main line through freight; and that on branch lines 65,888,167 ton miles were actually carried at a relative cost of 299 per cent of the cost of main line through, yielding 197,005,619 equated revenue ton miles

on the basis of main line through. A total of which equated revenue ton miles produces 927,131,954 equated revenue ton miles, carried at a total actual train operation expense for North Dakota for the fiscal year ending June 30, 1911, of $1,465,908.88 (see N. P. Exhibit 23), the cost of which calculated per 100 ton miles amounts to 15.811 cents, which, applied to the total ton miles of lignite carried for the fiscal year, to wit, 9,380,678, multiplied by 2.1 or 210 per cent, the ascertained ratio of expense that transportation of lignite coal bears to the equated cost of all freight (N. P. Exhibit 22), assigns the total relative cost of $31,146.75 as the approximate amount of the total train operation expense of $1,465,908.88 properly chargeable to the lignite traffic for that year according to the railroad computation.

But in the foregoing computation the railroad company has used, as appears from Exhibits 17 and the second subdivision of the first page of Exhibit 22, the actual lignite car mileage, classified to main line through, main line way, and branch lines, for a period beginning April 11, 1910, and running to June 30, 1911, or for more than one fiscal year by two and two-thirds months, and that, instead of the figures equated on the second subdivision on the first page of Exhibit 22, we should take the loaded car mileage divided in the main line way and through and branch line trains for the twelve months commencing July 1, 1910, and running to June 30, 1911, which carried forth produces the following as the equated car miles: Main line through actual car mileage, 129,648, at a relative cost of 100 per cent, yields 129,648 in equated car miles; 178,166 main line way car miles at 267 per cent yields 475,693 equated car miles; and actual car miles of branch lines, 38,387, at 299 per cent, yields 114,777 equated car miles, or a total of 346,201 actual car miles for main line through, main line way, and branch lines, for an equated car mileage of 720,118, or the relationship of 100 to 208, equivalent to a finding that the transportation of lignite coal costs 208 per cent of the equated ton mile cost of all freight. Turning again to N. P. Exhibit 20, we find the total ton mileage carried on main line through trains was 269,656,344, procured by multiplying 182,694 train miles by 1,476 tons, the average gross train load in tons on main line through freights. Treating main line way freight in the same way, we find it amounts to 26,030,790, procured by multiplying 38,910 train miles by 669, the average tonnage per train.

Treating branch line freight the same way, we find 29,165,972 as the ton mileage on branch lines, obtained by multiplying 72,143, branch line freight train mileage, by 404, the average branch line train tonnage, which, reduced to per cent, treating 100 per cent as the total of the three, resolves to 83.01 per cent for main line through trains, 8.01 per cent for way freight main line, and 8.98 per cent for branch lines, as the proportionate carriage of ton miles for the respective services. But we find that, although there is an error in Exhibit 20 of nearly 10,000,000 tons in the ton mileage, the correct figures were used in ascertaining the cost per 100 ton miles at 5.18 cents. And the same is true of the relative cost per 100 miles of way and branch line freight. And the proportions arrived at on Exhibit 20 are approximately correct at 100 per cent, 267 per cent, and 299 per cent, leaving, as the only correction, the application of 208 instead of 210 per cent to the equated ton miles of 9,380,728, the total lignite ton miles (see N. P. Exhibit 18), to the total cost as ascertained by equated miles of 100 ton miles, or 15.811 cents, yielding $14,831.75. But the relation of cost of lignite haul to that of other traffic is as 100 is to 208, hence, the $14,831.75 must be increased 108 per cent, or a total of 208 per cent thereof taken, which produces $30,850.12 as the actual cost of train operation to be apportioned to the lignite traffic under the railroad method adopted by both experts, or a difference in favor of the state on the computations of $296.64, occasioned by the application of the relation of 210 instead of the correct relation of 208 per cent as the relative cost of lignite to all other freight traffic. We find, then, that $30,850.12 was the approximate actual expense of train operation during the fiscal year properly chargeable against the revenue received from the lignite traffic haul.

## Switching Charges.

The next point of difference between the state and the company concerns switching charges. Upon this we accept the testimony of the railway company as to the fact that in the three switching yards, Fargo, Jamestown, and Mandan, the total cost of switching in making 599,022 car movements at these points was $149,471.21, approximately 25 cents per car movement. Referring to N. P. Exhibit 21, we find 4,412 cars

of lignite were moved during the fiscal year, of which amount, 2,532 cars were received at Bismarck from the Soo line, which cars so received concededly received two switching movements or 5,064 movements at Bismarck; and of the total cars moved 3,296 received four movements each, or a total of 13,184 switching movements; and that there was a single switching movement, incident to making and breaking trains in passing through terminals (as shown by tabulations of actual movements), of 1,636, giving a total of 19,884 switching movements at 25 cents per movement, or an expense of $4,971 chargeable to switching alone. Although the state in its brief contends this to be an overcharge, it seems to have been conceded as correct by the state's expert, Mr. Hillman. See page 526, abs.

In this connection let us say that no comment is made either in the testimony or in the briefs as to whether the Northern Pacific share of the switching charge for 2,532 cars, allowed at $2.50 per car by the rate bill in question (chap. 51, Sess. Laws 1907), to be apportioned between the carriers, has been figured in as revenue from the haulage of lignite coal. It is true that in the tables and in the testimony of Mr. Johnson, on page 182 of the abstract, statements are made "that the total revenue of the Northern Pacific from the movement of the coal was $63,904.20," but this is said in connection with freight earnings and average haul. This item alone would, assuming it was divided equally between the Soo and the Northern Pacific companies, amount to $3,165 each. However, counsel have assumed that this has been properly credited to the lignite revenue, and calculations made from N. P. Exhibit 1, in connection with the statutory rate allowed for carriage apportioned between the two carriers as to mileage, figuring at 27.1 tons per car, the cost would be approximately the $14.71 revenue per car for those received from the Soo line, inclusive of the switching charges. On such evidence, and from such deductions, we deem it established that the switching charge has been computed in, and is a part of, the lignite revenue, the total of which is $63,904.20, instead of being credited to the general earnings fund in excess of $6,000,000 in this state.

### Station Service.

The next general subdivision of expense is that apportioned to station

service.  We find that for the fiscal year station service was rendered within the state to 116,174 cars, 89 per cent of which, or 103,395, contained carload tonnage, within which class the 4,412 cars of lignite fall, and 11 per cent, or 12,779, contained merchandise or less than carload tonnage.  For the carload freight, as lignite coal, no station handlers are necessary, but for the merchandise or less than carload tonnage, freight handling cost is equivalent to 50 cents per ton for an average of 19.5 tons per car; or in other words, it approximately takes the same expense to unload the average carload of way freight of merchandise that it does to render station service to twenty cars of carload lots freight of the classification of lignite coal.  We can, then, equate either by carloads or by tonnage, and arrive at the same result.  Using carload lots, as has the state, we add to 103,395 carloads the result of 12,779 less than carload lots multiplied by 20, or 255,580 equated carloads, making a total of 358,975 equated carloads, which bore a total actual expense of $184,472.24, including therein, of course, freight handlers' charges, which equated on carload lots produces the 255,580 equated carloads.  Dividing the total expense by the total number of carloads we ascertain an equated or average actual expense of 47.4 cents per station service per car; and as each car of the 4,412 received station service at the point of origin and the point of destination, station service was rendered to the equivalent of 8,824 cars at 47.4 cents, or a total charge therefor of $4,182.58.

The state contends at pages 14 and 15 of its brief that the total number of equated cars should be applied to $129,134.24, the station costs, from which freight handlers' charges of $55,338 have been omitted. But the above computation has in effect already deducted the freight handlers' charges by equating the number of cars having less than carload tonnage.  In other words, in considering the 12,779 cars containing less than carload tonnage on a basis of 20 to 1, allowance was thereby made so that the application of the total equated carloads to the amount of expense, with freight handling expenses deducted, would be approximately the equivalent of deducting it twice.

Repairs, Renewals, and Depreciation of Freight Rolling Stock.

The statistics in evidence show that for the fiscal year the freight car

repairs, renewals, and depreciation apportioned to North Dakota on a basis of total revenue car mileage, both loaded and empty, was $518,679.37. This expense, applied to a total freight car mileage of 43,168,037 miles, yields a charge of 1.2 cents per car mile for this class of expense. Applying this cost per mile to the 593,462 car miles, both empty and loaded, actually traveled by the 4,412 cars in the fiscal year in delivering their lignite freight, yields a total expense of $7,121.54. Thus far both state and railway company agree, but the state contends that this is all that should be charged for this class of expense, while the company claims that, inasmuch as under the car service rules forty-eight hours of free time is allowed for loading, and the same amount for unloading, a total of four days' free time for both, that therefore the short haul business receives greater use of a freight car than does the long haul business, and applying to said four days' free time, the average travel of a car of 20 miles per day, the company would add to the actual mileage a charge for mileage of 80 miles per car, and charge therefor at 1.2 cents per mile, which, figured on the basis of the average haul of all cars, both loaded and empty, would necessitate the increase of the above expense by 21.8 per cent thereof, or $1,552.50. And the question is whether this item is properly chargeable. We believe it is not. This general class of expense arises from use of freight cars, it costing 1.2 cents per car mile for their use. Concededly they are idle during the four days of free time, and are not in use. We can see no foundation in fact upon which to base this charge, and therefore disallow it, and find that the total charge to be allowed against the lignite traffic revenue because of freight car repairs for the fiscal year to be $7,121.54.

### Traffic and General Expenses and Loss and Damage.

The next general division of expense is subdivided into three separate items as, (a) traffic expenses, (b) general expenses, and (c) loss and damage, for all of which the company seeks to charge the lignite traffic with 4.56 per cent of $58,953.07, the total revenue, or $2,688.26. The state concedes the fact that of this charge that apportioned to traffic and general expenses, in the sum of $1,456.14, is properly chargeable. This is obtained by charging the lignite traffic with the pro-

portion that the sum of the traffic expenses and general expenses, respectively $72,216.97 and $84,865.06, totaling $157,082.03, bears to the total freight revenue of $6,368,278, or a proportion of 2.47 per cent, which, applied to the gross earnings of the lignite traffic of $58,953.07, yields $1,232.12. The company claims that this percentage should be increased by the percentage ascertained in the same way, when $133,386.33 of loss and damage to freight has been so apportioned, which amount of loss and damage, the company claims, is a general overhead charge to be borne by all traffic in the proportion that the revenue from the traffic or commodity received bears to the entire freight revenue. On the contrary, the state contends that, as the freight rate on each commodity has been fixed with reference to the usual loss and damage shown by experience to result thereto in carriage, that this general item of loss and damage has already been paid by the freight collected on commodities on which the loss and damage resulted; and that, as no loss and damage is shown to have occurred arising from the carriage of lignite coal, that is, no lignite coal carried has been damaged or lost, the traffic in that commodity is not chargeable with any loss or damage. We believe the state's contention to be sound and unanswerable. Counsel for defendant company, in argument and in briefs in support of its contention, have given, as an illustration, damage arising from the wrecking of a carload of silk in transit by running into a freight train carrying lignite coal, and urge that, as the cause would be the obstruction causing the wreck, the damage resulting should be charged to all freight, because, if charged to the lignite traffic causing the wreck, all the revenue from said traffic for years might be more than equalized by the loss. Or if charged against any commodity, there would result perhaps a profit in carriage one year, while the same rate considered with the loss in the next year might result in a loss and be confiscatory according as loss or damage might occur. The basic fallacy in counsel's assumed case is that the freight rate on the train load of silk was fixed with reference to, and included as an element and item of charge therefor based upon probabilities, all dangers of wreckage. When application was made to the common carrier to transport this train load of silk, possibly from Seattle to New York city, so far as fixing the freight rate on the silk was concerned, in practical effect, the carrier had its option of carry-

ing the train load of silk with the risk omitted, and on that basis determining the freight rate with the risk omitted, and then insuring the arrival of the car at its destination and paying therefor and adding the amount of such insurance as an expense to the freight rate fixed without reference to such insurance; or, on the other hand, the carrier could do, as presumably they always do, not insure the arrival, but charge therefor adding the charge to what would otherwise be the fixed freight rate, thus carrying the insurance themselves. In fixing the freight rates on every commodity carried, this risk must be and is considered, and freight rates fixed with reference thereto. This is one of the elementary considerations in freight classifications. The source of this considerable item of expense sought to be charged as an overhead expense on all traffic is not shown, but it does appear that no portion of it arises from the lignite traffic; and presumably it has all been paid by rates fixed on other commodities on the basis of a reimbursement for such cost. And as they have been paid, the lignite traffic should not be charged with any part thereof when we are determining, as we are, the reasonableness of the rate that the legislature has said this lowest class of freight should bear. Doubtless some small charge for loss and damage should be made against this traffic, but the same should be sufficient only to reimburse for the loss and damage in the lignite traffic. As none is shown to have occurred during an entire fiscal year, the amount of an allowance in the rate for loss and damage would be no more than conjecture; and as the company makes no claims therefor based upon any probabilities of loss and damage in the lignite traffic itself, we will allow none. Accordingly, we refuse to allow the $1,232.12 item of cost urged by the company as arising from general loss and damage of freight apportioned to the state. However, the revenue from the lignite traffic should be charged with the traffic and general expenses in the sum of $1,456.14.

To recapitulate, we find the following to be correct charges against the revenue of the Northern Pacific Railway Company received from the lignite traffic, to wit: (1) For train operation expense, $30,850.12; (2) switching, 19,884 car movements at 25 cents, $4,971; (3) station service, 4,412 cars times two at 47.4 cents, $4,182.58; (4) freight car repairs, renewals, and depreciation, $7,121.54; (5) traffic and general expenses (no loss and damage allowed), $1,456.14; (6) main-

tenance of way and structures, 9,380,680 ton miles at .00759 per cent, $7,119.93; (7) taxes, 4.112 per cent of gross earnings, $58,953.07,— $2,424.15; making a total charge against the revenue from such traffic of $58,125.46. Deducting this amount from the $58,953.07, total revenue from said traffic, leaves the traffic yielding a net profit of $847.61 over and above all expenses and charges. With the finding of the foregoing facts, the discussion of the law applicable thereto will follow, after findings of fact have similarly been made as to the lignite traffic in the cases of State ex rel. McCue v. Minneapolis, St. P. & S. Ste. M. R. Co. and State ex rel. McCue v. Great Northern R. Co., companion cases to the one in which the above findings are found, and tried jointly therewith under the stipulation of counsel that the evidence in each case should be considered in all three cases so far as applicable, the cases for all purposes being by stipulation consolidated.

Statement of Facts as to the Minneapolis, St. Paul, & Sault Ste. Marie Railway Company.

We are satisfied that this railway company has furnished all the statistics at its command tending to throw light on whether the lignite traffic is carried within this state at a profit or at a loss. But the statistics in the main amount to but estimates, inasmuch as the known bases are wanting from which to make definite calculations. This is understood and practically admitted by the railway officials themselves. The testimony of Mr. Tombs, auditor and leading statistician of the defendant company, in the examination conducted by the railroad's own counsel, virtually admits the impossibility of arriving at the cost of carriage of this commodity from the statistics at his disposal, and that any result must be merely approximate, and deductions from the statistics concerning the operation, expenses, and profit of the whole system, instead of that portion of the system within this state, and must of necessity be too indefinite to be classed as even an approximate result of the cost of transportation of this commodity. Pages 122 to 133 of abstract. We have examined all of the tables of statistics furnished, and are forced to the same conclusion. And this necessarily rejects *in toto* the gross earnings theory which counsel for this railroad have endeavored to sustain as applicable under its proof. The gross revenue

method is properly applicable to the determination of certain matters, such as the expense for taxation, where a true relation exists between the basis taken and the result sought. It is possible that, if this was a case to determine a commodity rate applicable to the entire Soo system, with the commodity moving with a reasonable uniformity over the entire system, or under conditions not peculiar to a particular locality, that the gross revenue theory might be of value. But to determine the reasonableness of a freight rate on a single commodity moving within a prescribed radius of 200 miles from the place of its production, and that wholly within a single state, and of no greater amount or proportion of the total traffic than that of lignite coal, and with no basic figures except gross expenses and gross earnings, it is impossible to get even approximate results. At best they must amount to mere estimates. To illustrate, under the application of the revenue basis as made by the company in Tables No. 2, 3, 4, 5, and 6, Group A, and other tables into which the deductions are carried, all coal carried during the summer months returns a profit regardless of the rate, while all coal carried during the six other months of the year must return a loss, even though the rate be twice that of the summer months.

However, there is in the testimony some satisfactory proof on a portion of the issues involved. During the fiscal year in question, from June 30, 1910, to June 30, 1911, this railroad transported 205,038 tons of lignite in carloads of approximately 27.1 tons per car, or 7,566 carloads, for an average haul of 41.76 miles, for a gross amount of $83,670 revenue. From N. P. Exhibit 18, we learn that 2,532 cars, or over one third of this entire traffic, were delivered at Bismarck by the Soo line to the Northern Pacific, all of which came from Wilton under a 28-mile haul, the equivalent of 69,593.5 tons, or 1,948,625 ton miles (see Soo Exhibit 35), and for which the Soo line did not collect the rate for the ordinary haul of 28 miles, but instead collected such portion thereof as the haul actually made bore to the entire haul made by both roads, as required by the rate law in question. Turning to N. P. Exhibit 18, we find that the average haul for this identical portion of the traffic carried by the Northern Pacific Railway Company was 105 miles approximately, which, when 28 miles is added, makes a total average haul of 133 miles, on which haul the Northern Pacific received, on an average, $14.75 per carload, inclusive of its share of a

$2.50 switching charge.    By reference to the statutory rate, we find 71 cents per ton to be the charge for the entire haul, to which the $2.50 added makes an entire charge of $21.38, of which, for this consider- able volume of traffic, the Soo road has received the difference between that amount and $14.75, the Northern Pacific charge, or $6.63 per car for hauling, or an average of 24.5 cents per ton for transportation of this coal said 28 miles.    And as local conditions are matters of which the court will take judicial notice, we know that nearly 100 per cent empty car haul was necessary to earn this amount, as the north bound Soo freight from Bismarck to 28 miles north of Wilton must be practically nothing compared with this number of cars, 2,532, necessary to be used at Wilton for this haul.    This item constitutes over one third of carloads handled, and over one fifth of the entire revenue received from lignite haul, for the year, and we are convinced that this common carrier in particular has a cause of complaint, as made in the testimony of the president of the road wherein he states in substance that in operation the rate law as applied to their traffic is burdensome, and renders the same unprofitable, because of "the feature of the North Dakota law making a joint rate over two railroads for a distance," thereby compelling such transportation of coal to such an amount, and for what would otherwise be about usual switching charges.    The facts warrant at least the following investigation of the effect of the prorating portion of the rate statute:

The testimony is that the Missouri River division is the most ex- pensive in operation, and least remunerative of any of the divisions of this railroad, and that upon the Missouri River division three fourths of the entire lignite traffic is hauled for two thirds of the revenue re- ceived from lignite, leaving to the other one fourth of that traffic one third of the earnings from this commodity.    From this we can with reasonable certainty determine that another 2,500 cars of lignite handled on the Missouri River division, over and above the 2,532 cars used to make the lignite haul from Wilton to Bismarck on the Missouri River division, must also operate at either an actual loss or a noncompensatory rate.    And comparing conditions and traffic of this road with the Northern Pacific, operating in virtually the same terri- tory, and considering that the average haul of this commodity clearly favors the Northern Pacific railroad, while the empty car haul must

be equal and probably greater on the Soo than the Northern Pacific, we are satisfied that, as to the Missouri River division, lignite must be carried at an actual loss under the statutory rate and its application to the actual conditions under which the traffic is handled. Certain it is that the balance of lignite traffic in the state is insufficient in volume and revenue to make the traffic as a whole more remunerative on the entire Soo road within this state as to all lignite carried, than said lignite traffic is to the Northern Pacific road.

The average haul by the Northern Pacific of this lignite received from the Soo comes under a long or division haul, and may be classified either as main line through freight or as main line way freight, as its average haul is approximately 105 miles for the whole 2,532 cars so received, as to a 44-mile average haul for all other lignite hauled by the Northern Pacific, as appears from N. P. Exhibit 18. From this exhibit we also learn that the Northern Pacific Railway Company received $14.75 per car as an average charge for these 2,532 cars, or a total revenue of $37,347, from this portion of the lignite traffic received directly from the Soo road, leaving only $21,606.07 of a balance of lignite traffic revenue collected from its own road to make up its total revenue from lignite haulage of $58,953.07. For its portion of the haul the Soo gets, as heretofore stated, $6.63 per car, or 24.5 cents per ton, for transporting the coal 28 miles, where, if it were not for the last paragraph of the rate statute in question, it would receive 40 cents per ton and any switching charges, or, exclusive of switching charges, $10.84 per car, for what it now receives $6.63 per car for one third of its entire traffic in this commodity; and for which, but for this statutory provision requiring the rate to be figured over both carriers as a single haul, and apportioned between them, it would have received in revenue $27,446.88 exclusive of switching charges, while instead we find that, including its share of switching charges, it has received but $6.63 per car for 2,532 cars, for a total revenue therefrom of $16,787.16, or $10,659.72 less than it would have received had it delivered the coal to purchasers at Bismarck and collected the statutory freight therefor, and made no charge for switching expenses. With these figures and results, of which there can be no question, we can make the following calculations as to whether the Soo rate is remunerative or otherwise for at least this portion of its traffic: Let us compare

with the Northern Pacific first as to cost of conducting transportation, and apply the results to this traffic from Wilton to Bismarck. We have after considerable investigation determined that the expense of conducting transportation, as one item only of the aggregate expense, on the Northern Pacific, has cost that road $30,850.12 in earning the gross freight revenue of $58,953.07; or in other words, for every dollar of revenue received by the Northern Pacific road from the haulage of this traffic in this state, it has expended for conducting transportation 53.07 cents. We have also determined that the cost for operating expenses per ton revenue mile on the Northern Pacific road of all freight is 1.5811 mills, or that fraction over 15 cents per 100 ton miles; and that the relation between the relative cost of lignite and all freight is that of 208 to 1. Increasing the rate per ton mile by 208 per cent, we find a cost of 33 cents per 100 car miles if this traffic was carried on the Northern Pacific road. Each carload of lignite contains 27.1 tons, which carried 28 miles results in a ton mileage of 759 tons per car, the cost of which, figured at 33 cents per 100 ton mileage, gives for operating expenses alone an actual cost of $2.51. As this is but 53 per cent of the total cost of carriage on the Northern Pacific, as heretofore determined, we find that the whole cost will equal $4.73, without taking into account any classification of the service and of the fact that this is branch line service, and after its delivery to the Northern Pacific is carried as either main line way freight at a great cost reduction, or carried at a still less expense as main line through freight, the average haul being 105 miles, approximately a freight division, which would tend to classify it, or a considerable portion of it, as main line through. Now, applying the relative cost of main line way freight to this, we find the cost exclusive of switching would amount to $5.85 per car, the Northern Pacific relation of main line way to branch line freight being in the proportion of 266 to 299. But if we regard this when on the Northern Pacific as through freight, and compare this haul with the result of main line through freight, which would be more exact when the average mileage is considered, the computation would be made on a basis of relation of cost of 100 for main line through to 299 for branch line way, which would be practically the equivalent of taking three times the $4.73, or $14.14 per ton, as the cost of transportation when percentages are figured accu-

26 N. D.—30.

rately. Undoubtedly this is too high, and that the proper cost is about an average between the way line freight cost of $5.85, and this cost of 1.273 cents per revenue ton mile, figured on the 759 ton miles per car transported from Wilton to Bismarck at 27.1 tons per car freight for 28 miles, gives $9.66 cost per car freight that would have been the cost had the same haulage been made on the Great Northern line, assuming their branch line rate of cost as correct. The statutory rate for this distance yields a revenue of $10.84, which, at a cost of $9.66 per car, would leave a reasonable revenue of $1.18, or less than 4 cents per ton profit for the carriage of this commodity a distance of 28 to 30 miles. Instead, if we thus assume the cost to be $9.66 per car, carried for $6.63, under compulsion of the statute, we find it has been forced thereby to suffer a loss of $3.03 per car, which, figured on 2,532 cars, shows a loss on this basis of $7,671.96. And the above computations omit the fact that the empty car mileage haul chargeable against this particular movement must approximate 100 per cent, while in the figures applied the Northern Pacific empty car haul was approximately 71 per cent only. We may assume, however, that some of this is offset by the "turn around" service testified to by Mr. Little as frequent on this particular haul. Abs. 352. But it is apparent that if it was legislative wisdom to fix the statutory rate for this haul for this commodity at 40 cents per ton for a haul from 25 to 30 miles, then, when the volume of this particular haul is considered, it would seem that it was far from wisdom to compel an apportionment of such receipts and their reduction from 40 cents to 24.5 cents per ton for said distance where the traffic is delivered to a connecting carrier. The practical operation of the statute is thus to reduce the rate as here and give more than its just proportion of the freight revenue to the connecting carrier. As heretofore observed, from the fact that the average haul of this traffic delivered by the Soo to the Northern Pacific road is approximately 105 miles, while the average haul of all of its other traffic is less than 45 miles, the Northern Pacific gets a ton mileage of 7,164,258 from this traffic originating on the Soo, while from all of its other lignite traffic its ton mileage is only 2,216,420. Therefore it would seem that the traffic thus obtained by the Northern Pacific from the Soo does not operate to reduce the freight receipts of that road as materially as it does that of the Soo,

which road, from the proportionate very short haul of the same freight movement, has correspondingly suffered a considerable loss.

Let us further analyze the lignite traffic on the whole Missouri River division with particular reference to the effect of the short haul and volume of lignite traffic from Wilton to Bismarck delivered to the Northern Pacific.

From Soo Exhibit 50 we ascertain that all lignite carried on this division amounted to 139,899 tons, carried an average of 47.46 miles, producing a live ton mileage of 6,639,737 ton miles, for which a total freight revenue amounting to $56,993.72 was received. That the average carload of lignite on this division amounted to 27.32 tons. Now, turning to Soo Exhibit 35, table 27, page 1, we find the total shipment from Wilton to Bismarck for delivery to the Northern Pacific amounted to 69,593.75 tons, carried 28 miles, and amounting to 1,948,625 ton miles. Deducting this tonnage and ton mileage from the total division tonnage and ton mileage, we have remaining respectively 70,306 tons, yielding a gross mileage of 4,691,112 ton miles of other lignite shipments for the year. But of this 70,306 tons, we find more than one half thereof, or 37,173 tons, as appears from Soo Exhibit 35, page 1, third item, was delivered to local Bismarck dealers, under a shipment of 28 miles from Wilton, yielding 1,040,844 ton miles. Now, deducting this Bismarck local ton and ton mileage, we have respectively 23,133 tons, with a ton mileage of 3,650,268 remaining for the entire division; so that from the output of the Wilton mine delivered at Bismarck, 69,593 tons to the Northern Pacific connecting carrier, and 37,173 tons for local consumption, all for a haul of 28 miles for an aggregate ton mileage of 2,989,469 ton miles, out of a total lignite traffic on that division of 6,639,737 ton miles, leaving of the total balance of lignite traffic for the division 3,650,268 ton miles, produced from 33,133 tons, or an average haul for the one fourth of the lignite traffic remaining on the division of 110.16 miles, after the deduction of the Bismarck local and the Bismarck joint freight. Reduced to freight receipts, we have heretofore demonstrated that the Soo road received from the joint Northern Pacific haul, as its share thereof, $16,787.16; and from the 37,173 tons delivered in Bismarck for local consumption, at the statutory rate of 40 cents per ton, it received $14,869.20, or total freight receipts from Bismarck of $31,656.36;

and on the balance of the division from the lignite traffic, the difference between that amount and $56,993.72, or $25,337.36. Of course, the above computation does not include any transfer switching charges or other switching charges made and turned into the lignite freight revenue. It is interesting to note, however, that three fourths of the tonnage of this division is for a 28-mile haul from Wilton to Bismarck, for over one half of which the Soo must further reduce its receipts by division with the Northern Pacific connecting carrier from the statutory rate of 40 cents to 24.5 cents per ton in compliance with the statute. Further, that of the total 139,899 ton lignite haul on the Missouri River division, all but less than 1,000 tons is the output of the Wilton mine, as will be observed by a study of table 27, Soo Exhibit 35, pages 1 and 2. With this in mind it is interesting to note, as verifying our conclusions, that the average haul aside from the Bismarck local and joint haul is 110 miles, while the average haul of the same coal from Bismarck by the Northern Pacific connecting carrier is 105 miles.

The deductions from the foregoing establish that three fourths of the lignite freight on the Missouri River division is carried at approximately 1 cent per ton per mile from Wilton to Bismarck, while, if the statute did not require the prorating for the one third of the traffic delivered the Northern Pacific, it would receive the statutory rate of 40 cents per ton for 28 miles, or 1.44 cents per ton for the same carriage. The foregoing figures, and also matters of which we may take judicial notice, are conclusive that the conditions existing on the Northern Pacific and the Soo are similar, both roads traversing virtually the same lignite field, and that of the two the Northern Pacific can carry at the least expense. And in the Northern Pacific Case we have seen that the cost of similar carriage on that road is about that of the Great Northern, running from 1.2 to 1.3 cents per revenue ton mile. Therefore, out of the approximately 140,000 tons of lignite haul on this division, all but approximately 33,000 tons must have been hauled at an actual and considerable loss, and as to freight receipts the road lost money while earning $35,000 of the $57,000 gross earnings from the lignite traffic on this division; and that in earning $17,000 of the $35,000 upon which it lost, it lost approximately $11,000 over what it would have received but for the compulsory pro-

rating with the connecting carrier. Comparing also with our conclusions in the Northern Pacific Case, to the effect that that road under more favorable conditions, inasmuch as it is not forced to share its rate computed upon a basis of a short proportion of a connecting carriage haul with any other railroad, has, on approximately the same volume of business as done on the Missouri River division of the Soo road, realized less than $1,000 profit, we can draw no other conclusions than that the Soo on its Missouri River division must have sustained an actual loss of from $9,000 to $12,000.

Let us now consider the remaining one fourth of the lignite traffic conducted by the Soo on divisions other than the Missouri River division, to ascertain whether such loss can be equalized by other portions of the Soo line within this state. From Soo Exhibit 51, page 122 of the Book of Exhibits, we ascertain that the balance of the lignite traffic for that year, exclusive of the Missouri River division, was 65,139 tons, but that the average load per car was 21.51 tons, or about 6 tons per car less than on the Missouri River division, which tonnage yields 3,028 car loads of lignite freight carried during the fiscal year by this road elsewhere than on its Missouri River division, and for which it received, as shown by this table, $26,676.28, with an average car haul for lignite of 23.13 miles only.

We now observe that a condition exists in the northwestern part of the state, in the lignite fields north of and adjacent to Minot, similar to that above shown in the Bismarck territory, in that the Soo must deliver a considerable portion of its lignite traffic to the Great Northern railroad at Minot, the same as it has divided the Missouri River division traffic with the Northern Pacific at Bismarck, and be compelled to prorate or reduce what would otherwise be the statutory haul proportionate to the entire haul on both roads. The exact amount of this is ascertainable from Soo Exhibit 35, pages 2 to 6 inclusive, from which we ascertain the following joint hauls, to wit: From Wilton to Minot, for 162 miles, 1,153 tons, amounting to 18,681 ton miles; from Bitumina to Minot, 20 tons transported 141 miles, for 2,820 ton miles; from Smith's Kenmare mine to Minot, 66.6 tons transported 52 miles, for 3,463 ton miles; from Wye to Minot, 47 tons transported 47 miles, for 2,209 ton miles; from Vanderwalker to Minot, 3,244.4 tons transported 13 miles, for 42,177 ton miles; from Lloyd's to Minot, 2,675.25

tons transported 11 miles, for 29,439 ton miles; from Burlington to Minot, 1,498 tons carried 8 miles, for 11,982 ton miles; from Davis to Minot, 616 tons, carried 7 miles, for 4,312 ton miles; or an aggregate of 9,231 tons carried an average of 13.3 miles, for a total of 115,083 ton miles, amounting to 433 carloads delivered to the Great Northern and hauled by it an average of 66.4 miles (see G. N. Exhibit 1), and upon which the Soo rate is to be figured on its proportionate share of a 78-mile haul, for which total haul the statute allows a charge of 55 cents per ton, of which amount, exclusive of the division of switching charges, the Soo road would get twelve seventy-eighths, or less than 8.5 cents per ton, or $1.83 per car, where, without the prorating feature of the statute, it would receive 35 cents per ton, or $7.53 per car, or $5.77 per car more, which, figured for 433 cars, deducts $2,468.10 from what would have been the Soo earnings but for the final paragraph of the statute in question, which in practical operation reduces what would otherwise have been its earnings on 433 cars at $7.53 per car, or $3,260.49, to $792.39. Hence, one seventh of the lignite freight carried on the Soo, other than on the Missouri River division, is compelled to be carried practically gratis and at a loss of $2,468, or that much less than a reasonable rate, if the balance of the statute other than the final paragraph be taken as establishing a reasonable rate. So that on both divisions, including the connection with both common carriers, this road is compelled to carry 78,915 tons, or the sum of 69,594 tons at Bismarck and 9,321 tons at Minot, delivered to connecting carriers, at a great actual loss out of its total lignite freight of 242,981 tons carried on the Missouri River division, and 65,139 tons of lignite carried elsewhere in the state, out of an aggregate haul of 308,120 tons; so that approximately one fourth of its entire lignite traffic is carried at a loss of the sum of $2,468.10 on the Minot transfer, and $10,659.72 on the Bismarck transfer, to connecting carriers, or a total loss of $13,127.82 over what it would have received, had it carried the same freight the same distance under the statutory rate without being compelled to prorate its rate with the connecting carrier. We may here observe that, as to both the Great Northern and the Northern Pacific carriers, practically no prorating is required or possible, they being the recipients of benefits therefrom that would otherwise go to the Soo carrier; so that none of this shortage is equalized as

to the Soo road by its receiving similar benefits from any connecting carriers. We observe also from Great Northern Exhibit 1 that, according to the Great Northern tables found on page 57 of the Book of Exhibits, it acknowledges the receipt from the Soo of 10,232 tons, carried 66.4 miles on the Great Northern road for an aggregate ton mileage of 678,978 ton miles, which is about 10 per cent in excess of the showing and calculation heretofore made from the Soo tables, No. 27 Soo Exhibit 35, pages 2 to 6. The court will take judicial notice that the only connecting carrier with the Great Northern at Minot is the Soo railroad, as no other railroad enters that city. We observe also that the average lignite haul on the balance of the road within this state, other than the Missouri River division, is but 23.13 miles, while that with the Missouri River divisions slightly more than double this, or an average lignite haul of 47.46 miles. One need not be a rate expert to realize that usually the longer the haul the greater the net profit, and that it is on the long haul the railroad is enabled to move the freight at the least cost per ton mile. The longer the haul the greater the volume per train load, the less breaking of trains and switching, and the more accordingly that the road avoids the excessive cost of branch line service. In reality practically all of the haul of lignite by the Soo in this state is conducted at a cost equivalent to cost of branch line service.

It seems, therefore, that, if the statutory rate for the short haul of 50 miles or over is a reasonable rate, and one for which the carrier should be entitled to charge for ordinary transportation, and the presumption from the statute is that it is a reasonable rate, the volume of traffic on the entire Soo system within this state is insufficient and carried under too short a haul for it to equalize the loss of $13,128 occasioned by the compulsory prorating with connecting carriers in the $70,542 worth of revenue earned in the carriage of lignite, presumably at the rate fixed by statute. Or, in other words, we must conclude that the Soo loss was considerable because of the connecting carrier feature of this statute, when it has carried for $83,670 what it otherwise would have received $96,798 for, and for which, had the same carriage been made on the Great Northern or Northern Pacific lines, they would have received approximately such amount therefor. In effect and practical operation we cannot conclude other than that the actual figures

show with reasonable deductions therefrom, that the final paragraph of chap. 51 of the Session Laws of 1907, compelling the prorating of rates between connecting carriers, discriminates against the Soo, and, if the statute be otherwise taken as prescribing reasonable rates, forces the Soo to carry its entire lignite business at an actual and considerable loss, or less than the actual reasonable expense of carriage; while at the same time, under our findings as to the Northern Pacific Railway Company, and under the facts found as to the Great Northern Railway Company, both the Northern Pacific and the Great Northern are making a profit on the rates as established and accruing to them, because (1) they are the beneficiaries of the contribution enforced from the Soo by the particularly objectionable feature of the statute compelling prorating of rates, and (2) their revenues are not reduced as materially by the prorating feature, and they have the advantage in prorating, having the long haul in a proportion of five to one or more over the Soo line. In this respect it is noticeable that both the Northern Pacific and the Great Northern take about an equal proportion from the Soo under this contribution, when we consider the volume of their business and earnings, that of the Northern Pacific being, for the twelve-month period, $58,953.07, while the Great Northern gross earnings from the lignite traffic for the same period are $17,756.52. The evidence discloses that, with the aggregate haul of lignite on the Soo averaging as it does approximately 35 miles only, and considering the large amount of this commodity it is compelled to deliver to connecting carriers to its injury, disproportionate to the injury of the receiving carriers through compulsory prorating, it is, as to nearly half the lignite business, virtually a branch line of the other two railroads in accumulating for them their lignite traffic. The prorating feature, therefore, on the facts, favors such connecting carriers to the injury of the Soo line. This takes us to a consideration of the Great Northern Case.

Statement of Facts as to the Great Northern Railway Company.

The Great Northern railroad is, for accounting purposes, divided into accounting divisions, each main line railroad division constituting an accounting division, and each branch line, of the ten or more in

this state, also constituting an accounting division, and were so kept for the fiscal year in question, from June 30, 1910, to June 30, 1911, and all of the statistics as to lignite coal carriage and revenues are actual computations from freight waybills. The amount of the tonnage and the net revenue therefor, as well as the origin and destination of all shipments, are facts, and not estimates. The same is true of gross loaded and empty freight car mileage. Those expenses capable of allocating have been charged to the particular division and line, whether main or branch, and compilations have been made therefrom as to the total earnings of branch and main lines within this state, and total expenses incurred therein or properly assignable thereto on some relative basis, either of mileage, tonnage, revenue, or expense basis. See G. N. Exhibits 1 to 6, pages 57 to 62, Book of Exhibits, and state's G. N. Exhibits 33 to 48 Q4, pages 192 to 232, Book of Exhibits.

We do not deem an exhaustive analysis of these many exhibits, and the testimony offered explanatory thereof, necessary to the development, with reasonable certainty, of the problem of whether the statutory rate on lignite coal for the year in question was compensatory or confiscatory in its effect on this road. But we will state only sufficient to develop and maintain our conclusions.

For the year in question the total freight revenue assignable to the state of North Dakota from all freight amounted to $6,850,656.68, out of which the receipts local to the state, and not to be classed as interstate, but intrastate strictly (which includes lignite revenue of $17,492.41), were $371,222.78; the average carload for all freight amounted to 13.15 revenue tons; while the average carload of lignite contained 17.85 revenue tons. But in both cases the actual average live carload tonnage is reduced by a charge made against it of the percentage of empty tonnage or empty car haul chargeable to the traffic, that of all freight being thus reduced by the proportion of the empty to loaded car mileage, to wit, 17.6 per cent as to all freight, while the average load of lignite is so charged with the proportion of 25.21 per cent,— the relation that actual computation shows empty car mileage bears to the total loaded and empty car mileage used in the lignite traffic. See Exhibit 6, page 62. The actual ton mileage of all freight is approximately but 16 tons per car, while that for lignite coal amounted to 25.83 tons, a difference of nearly 10 tons per car in favor of this coal. In

the method used of determining the cost of hauling this commodity, the company has ascertained that out of a total ton mileage of 2,318,-345 ton miles for lignite, 1,423,182 ton miles were hauled on its main line, while 895,163 ton miles were hauled on the branch lines. As to all freight within the state, it has determined, with approximate correctness, that 704,312,900 ton miles were handled on its main line, and 30,881,587 ton miles were handled on its branch lines, or a total of 755,194,484 revenue ton miles, at a total expense of $3,008,-555.13 as to main line freight, and $647,905.02 expense of branch line freight operation, both being inclusive of taxes. It has divided the total main line operating expense, slightly in excess of $3,000,000, by the total revenue miles moved on the main line, in excess of 704,000,000 of ton miles, and produced, as the average cost per revenue ton mile for the main line, 4.27 mills per revenue ton mile. Similarly treating the branch lines by dividing approximately $648,000 operating expense, by approximately 51,000,000 ton miles moved on the branch lines, produces an average cost of 12.73 mills, or approximately three times the expense of 1 ton mile on the branch lines to 1 ton mile on the main line. It has then applied these figures, to wit: multiplied the main line lignite tonnage, 1,423,182 tons, by the cost per ton, 4.27 mills, and produced $6,076.99, which it alleges to be the actual cost of carriage of the lignite transported on its main line. Taking in the same way the cost of moving its branch line lignite freight of 895,163 ton miles, at 1.273 cents per ton, yields as the branch line cost of lignite haulage $11,415.42. Adding these two amounts produces $17,-492.41, which the railroad company alleges to be the approximate cost of transporting 36,678 tons of lignite for an average of 63.2 miles of haul, for which it received, as total freight receipts, $17,556.52, receiving an average of .766 mills per ton mile. It has offered testimony tending to show that even this apparent small profit of $264.11 is more than overcome by conditions peculiar to the lignite traffic, and impossible of exact ascertainment, among which it enumerates a larger empty car mileage in the haulage of lignite than as to average freight; that its main line haul is in reality a main line local train service; that the cars used for hauling this coal are idle in loading, in proportion to the time they are moving, more than in handling other freight commodities; and, lastly, that they are hauled during the winter sea-

son during cold weather, when the locomotives are unable to haul their full tonnage; and for these reasons urges that this apparent profit, which would be yielded by the average freight in the same volume and under average freight traffic conditions, should be changed to an actual loss.

It is apparent that in this manner of attempted ascertainment of the cost of moving this commodity, the result is not even approximately the actual cost of moving this lignite coal, but instead is what would be its cost assuming it to be carried under the average conditions and at the cost of the general average of all freight. For instance, the railroad's computation of 4.27 mills as the cost of carriage of this commodity on the main line probably does not cover its actual cost, for the reason that this small volume of lignite traffic is buried with five hundred times its volume of other traffic and a general average struck, which may favor the state's contentions in this case, inasmuch as it is apparent from an investigation of the Northern Pacific Case, based upon actual figures and a classification of the lignite traffic on the main line into main line way and main line through, concerning which no such classification is made or attempted in the Great Northern Case, it would seem that its figures are at least sufficiently low, if not under the actual cost of carriage of this commodity on the main line. In any event, from the very nature of its ascertainment, it must be at best but an estimate.

And the same is true of the railroad's deductions as to the cost of that portion of the lignite traffic carried on its branch lines. We may here note that out of 895,163 ton miles handled by the branch lines over three fourths thereof, or 719,000 ton miles, is the product of the Noonan mines transported an average haul of 78.8 miles, or exceeding by one fourth, or 15.6 miles, its average haul of 63.2 miles of all lignite coal. The output of this mine amounted to 12,835 tons, or approximately 500 carloads. Also there was delivered to this carrier by the Soo at Minot 10,232 tons, or approximately 400 carloads, hauled by it an average of 66.4 miles, or in excess of its average haul of all coal, a portion of which haul, amounting to 131,219 miles, was Great Northern branch line haul. So, the freight originating at Noonan and Minot constitutes all but 45,000 ton miles of the total branch ton mileage of 895,000 ton miles; 520 carloads cover balance of tonnage of

lignite carried by both branch and main line service. Everything considered, it would seem that the railroad company's charge of approximately three times its main line haul for this branch line service to lignite freight is excessive, and considerably so, and to an amount that would at least equalize any undercharge for its main line haul. While it is true that in the Northern Pacific Case the relation between main line haul and branch line service is approximately three to one, or as 100 is to 299, yet the ratio does not here hold true, because we do not know whether the main line service here rendered was main line through or main line local, not being classified, it being but the average of the cost of all main line freight local and through. Indeed, a knowledge of the country, of which we may take judicial notice, and the testimony of Mr. Martin, would rather establish this main line service to be main line way freight service. If so, taking the basis determined in the Northern Pacific Case, the relation of cost would be as 266 is to 299, which would render these railroad figures as to cost of branch line service to lignite grossly excessive, if it be conceded that the proper charge is made for main line freight at 4.27 mills.

It is apparent in the railroad figures that certain charges have been included and prorated against the cost of all freight in this state, which apparently are not chargeable against the lignite traffic. Reference is made to traffic and advertising expenses found in plaintiff's G. N. Exhibit 46E, page 216, Book of Exhibits, under charges against "outside agencies, advertising, and traffic associations," aggregating approximately $300,000, of which 3 per cent, as appears from the testimony of Mr. Martin, is charged against North Dakota freight receipts. As the lignite receipts amount to a fraction of a per cent only of the total freight receipts, we do not compute the small difference to be added to profit from this source. No reason exists, however, why the lignite traffic should be charged with any part of this expense more properly chargeable to the traffic benefited, it being admitted that there is no benefit to the lignite traffic, which is noncompetitive and must be the traffic of the road upon which it is located. It appears that a similar charge has been erroneously made as to freight handlers, but that the same is too trivial for attempted determination. As to the railroad's claim for right of reduction of earnings as figured by it, because of extra expense of the haul for the reasons above related, we cannot

see but what all items mentioned therein have been included, and proper charges on deductions therefor made in the expense computations under the classifications thereof in Exhibit 4, conceded by Mr. Martin to be used as a basis in apportioning and allocating the expense. Most of the reasons given are but those we believe to be usually incident to the expense of way or local freight trains, and included in the ascertainment of the cost of transporting by way or local freight. They urge here, as it has been urged in the Northern Pacific and Soo Cases, that the winter and cold weather increase the cost. This contention may have some basis in fact, but the rates must be regarded as fixed upon an average yearly basis, and if the rate is a reasonable one in other than winter seasons, it must be taken as reasonable for the winter season also. The railroad must keep its line open and operating in all seasons, and the expense of so doing is not a charge against any particular commodity, although possibly it may amount to an overhead charge, and to a certain extent be necessary to be considered in fixing a reasonable commodity rate. A share of this overhead expense has been already assigned to this commodity under maintenance of way and structures accounts. Exhibit 33, page 192, Ex. S. From a comparison of conditions, rates, and traffic shown with that of the Northern Pacific, and considering that only two sevenths of the carloads, and only one fourth of the volume or ton mileage, is delivered it by the Soo, under which the statutory apportionment reduces its freight receipts approximately 1.25 mills per ton mile for the same distance haul, as is apparent from plaintiff's Exhibit 48A, page 247, Book of Exhibits, and G. N. Exhibit 1, page 57, it is certain that the earnings of this road are not diminished by the prorating connecting carrier clause of this law to the same degree as the Northern Pacific on the Bismarck joint Soo haul, where it hauls over 7,000,000 out of over 9,000,000 of lignite ton miles under a reduced tariff, because of the prorating with the Soo required by the statute. In tonnage 70,000 tons is carried by the Northern Pacific under said joint haul, to 50,000 tons carried without it. It is this prorating feature that reduces the Northern Pacific earnings to nearly its actual cost of transportation. Compare N. P. Exhibit 18 with G. N. Exhibit 1.

The Great Northern has a much less empty car mileage in the lignite traffic than the other roads. The empty car haul of the Northern

Pacific is 72 per cent of the loaded haul, the Soo is 90 per cent empty haul to loaded haul, while as to the Great Northern, taking the total loaded and empty haul as 100 per cent, the same is, loaded 69.1, empty 30.9 (G. N. Exhibit 6), or the empty car mileage is 43 per cent of the loaded car mileage. This means that the Soo empty car mileage is more than double that of the Great Northern, and that the Northern Pacific percentage of empty car mileage of 72.23 is 167 per cent of the Great Northern empty car mileage of 42.27. On the Northern Pacific the average relation of a carload of lignite to all other freight is as 26.87 tons is to 19.25 tons (N. P. Exhibit 19), or that a car of lignite contains 140 per cent of the tonnage of the average carload of all freight. On the Missouri River division of the Soo line the average tonnage per car of lignite is 27.32 tons, while the average tonnage per car of all freight is 12.27 tons. Thus, a car of lignite carries on the average 222 per cent of the revenue tonnage of all freight on that division. See Soo Exhibit. 50. This is the ratio for three fourths of the lignite traffic of the Soo; for the other one fourth, or that portion carried other than on the Missouri River division, the ratio of lignite load to all freight is as 21.51 is to 14.74 (Soo Exhibit 51), or a percentage of 139 per cent of lignite to all freight. The Great Northern average lignite load was reduced by the 400 carloads received at Minot from the Soo line, which averaged 21.51 tons, to the general average of 25.83 tons as the average lignite carload on the Great Northern.. See G. N. Exhibit 44, page 204, Book of Exhibits, from which we learn that the carload average for all freight is 16 tons, giving a percentage of 161, the average car hauling that percentage of lignite compared to all freight. The lignite carload, then, on the respective roads, is to all other freight, as follows: Soo, 207 per cent; Northern Pacific, 140 per cent; Great Northern, 161 per cent. Against this, as tending to equalize lignite with all freight, is an empty car percentage of Soo, 90 per cent; Northern Pacific, 72.23 per cent; Great Northern, 43.27 per cent. When we consider that the empty car movement is a movement of 16 tons per car moved wholly at an expense, the empty car being of the same weight on all roads, we find it necessary to equate on a basis of 100 per cent of empty car mileage applied to relative carloads, which would produce the following figures: As to the Great Northern, raising 43.27 per cent to a common basis of 100 per cent

empty car mileage, it would realize from a revenue mileage tonnage of 59.7; the Northern Pacific on the same basis would have 37.2 revenue tons, and the Soo, considering the volume of traffic on all divisions, an average live tonnage of 25.87 per car, which equalized on a basis of 100 per cent produces 28.8 tons. We have, then, as the equated ratio of revenue tons to empty car mileage, with all roads equalized on the same empty car mileage, the Great Northern hauling 59.7 tons, while with the same empty car mileage the Northern Pacific hauled 37.2 tons, while with the same empty mileage the Soo has hauled 28.8 tons of lignite. But when the lignite carriage is compared on this basis with the relative loads of all freight, we find each equated· average tonnage increased by the following percentages of lignite over all other freight per carload, to wit: Great Northern 161, Northern Pacific 140, Soo 222, which, applied to the equated empty car to all other freight tonnage above, gives Great Northern 96.11, Northern Pacific 52.08, and Soo 63.9, as the relative cost to all other freight as to each railroad. But, owing to the Northern Pacific carrying a larger average carload of all freight than the Great Northern, this ratio is reduced accordingly and proportionately in the ratio of 19.25, average carload on Northern Pacific, to 16, average carload on Great Northern, leaving the proportion 96.11 on Great Northern to 62.66 on Northern Pacific. Therefore, we find when the average load of lignite is equated to all freight, and again equated with empty to loaded car mileage, these roads hauling lignite at the following relative expense per revenue ton carried, accruing because of empty car mileage, as follows: The Great Northern gets 96 to the Northern Pacific 62.66 tons of lignite revenue haul for the same relative empty car haul, it costing the Great Northern but two thirds per revenue ton for empty car mileage in lignite traffic as is expended by the Northern Pacific. This is to a small extent equalized in relative expense per car mile, as between the Great Northern and Northern Pacific; by the fact that the Northern Pacific has an average haul of lignite of 79 miles, while the Great Northern average haul is but 63 miles. But all things considered, the Great Northern expense for empty car mileage is but approximately two thirds of that of the Northern Pacific as applied to the lignite traffic per revenue ton. And, inasmuch as, with two thirds of the expense for this item, the Northern Pacific profit on lignite

haul would have been sufficient to render the rate as to it reasonably compensatory, we conclude it must be so taken under these computations as reasonably compensatory to the Great Northern, under the conditions under which it handled lignite freight during said fiscal year.

### Findings of Fact.

From the foregoing analysis of the evidence we deduce the following ultimate findings of fact, to wit:

(1) That the Northern Pacific Railway Company during the fiscal year ending June 30, 1911, received from its lignite traffic, conducted wholly within this state, $58,953.07. That the total cost of transporting all lignite freight during said period, and from which the above earnings were received, was $58,125.46, leaving as net earnings to the railroad from said source $847.61. Said coal was carried under the freight rates prescribed by chapter 51 of the Session Laws of 1907, governing rates to be charged for intrastate haulage of lignite coal. That under the above earnings we find that the rates are, as to the Northern Pacific railroad, slightly remunerative, but noncompensatory under the conditions prevailing along its line in this state as to the lignite traffic.

(2) As to the Great Northern Railway Company, the court finds that for the fiscal year ending June 30, 1911, it earned in gross receipts from the hauling of lignite coal $17,492.41, at an expense to it of not to exceed $15,000; and that as to the Great Northern Railway Company the statutory freight rate for lignite coal prescribed by chapter 51 of the Session Laws of 1907, governing said carriage, provided a remunerative and reasonably compensatory tariff or freight rate as to said commodity, under the conditions prevailing on its line within this state.

(3) As to the Minneapolis, St. Paul, & Sault Ste. Marie Railway Company, the court finds that during the fiscal year ending June 30, 1911, the gross earnings of that road from the carriage of lignite coal were $83,670, of which $56,993.72 were the freight receipts from this commodity on its Missouri River division, upon which was handled three fourths of the entire lignite tonnage, and $26,676.28 was received

from the haulage of lignite within this state without the Missouri River division, for the haul of the remaining one fourth of the lignite traffic handled by this road. That so large a per cent of the tonnage originating on the Soo railroad is delivered at Bismarck and Minot to connecting carriers, under which its charge is prorated as required by the final paragraph of chapter 51 of the Session Laws of 1907, and under which the Soo proportion of its charge is required to be apportioned to the total haul, is so reduced as to deprive it of $13,128 which it would have received at the statutory rate, were it not for the prorating feature of the statute, it in effect receiving $83,670 for what it otherwise would have received $96,798. That the court finds that, because of the effect of this prorating feature of the statute, the entire lignite traffic on said railroad for said year was carried and handled at a net loss to it, over all receipts and revenue from said traffic in said commodity, of from $9,000 to $12,000. That because of conditions peculiar to this road and its connections with the Northern Pacific Railway Company at Bismarck and the Great Northern Railway Company at Minot, the prorating feature of the rate law in question operates to the injury of the Soo railroad in the transportation of this commodity much more injuriously than it affects its connecting carriers, the Northern Pacific and the Great Northern Railway Companies as to freight earnings from lignite coal. That prior to 1907 all three of these railroads were operating and carrying lignite coal freight with railway connections the same as at present and as existed during the fiscal year in question. That the reproductive and actual value of the Soo railroad property within this state, and engaged in and necessary to its use as a common carrier during said fiscal year, has not been established. Nor has any apportionment of the value of its railway property within this state been made as to the portion of value thereof attributable as earning its intrastate earnings, or any portion thereof as earning its interstate earnings, earned within this state. That the percentage of lignite traffic to all traffic during said year was in revenue as to the Missouri River division 16.6 per cent, and in volume of freight 45 per cent of all other freight on said division. But the court finds that the carriage of lignite coal increases the railroad expenses but 60 per cent of the usual statutory rate for the lignite haul; or in other words, but 60 per cent of the full statutory rate allowed (as the freight

26 N. D.—31.

tariff on lignite coal) is out-of-pocket costs therefor, or the proportion of the statutory rate made necessary to be expended because of said lignite haul, the remaining portion of the statutory rate and any amount in excess thereof as expenses arise from the apportioning to the lignite traffic of certain fixed charges or railroad expenses that would have accrued had no lignite coal been transported. That all receipts from this traffic in excess of the out-of-pocket costs contribute toward payment of fixed expenses of the railroad that would have existed without this lignite freight movement, and would have been borne by other freight instead of by lignite to the amount it has so contributed to its payment.

## Preliminary Observations.

Although we refer herein to the legislative rate in question as one regulating lignite coal, the rate in fact is a maximum rate upon all intrastate coal shipments, as we held in our former opinion reported in 19 N. D. 45, 25 L.R.A.(N.S.) 1001, 120 N. W. 869. While it has application almost solely to lignite coal, the proof shows it has governed other shipments, the amounts of which, however, are not included in any of the computations made in these findings.

This statutory rate is low. The prorating feature further reduces it, and is in effect the teeth of the statute and the portion of it that operates to the disadvantage of the Soo carrier. That part reads: "In case any shipment of coal under the provisions of this section must pass over two or more lines of railroad to reach its destination, then an additional charge of $2.50 per car for each transfer may be allowed and collected to cover cost of switching, and the total amount of freight and switching charges shall be divided among the several railroads concerned, upon such basis as to them may seem just; provided that, if such railroads cannot agree among themselves upon an equitable division thereof, then the board of railroad commissioners shall decide the matter, subject to appeal to the courts." The state contends that because the Soo has under agreement with the connecting carriers prorated according to the length of haul, and not appealed to the board of railroad commissioners for a larger share of the total joint haul freight receipts than they have taken under the arrangement in ques-

tion, that they should not be heard to complain if their receipts have been considerably reduced through prorating. But it is difficult to see what basis other than the one adopted by agreement as a general rate to fix the varying haul could be taken. But, assuming that the Soo road could have realized a greater share of the joint haul as the result of an appeal to said board, nevertheless the same case would have been before us, because whatever was thus thrown into the coffers of the Soo road would be taken from the net revenues of the Northern Pacific carrier principally, which would have reduced the receipts of that road from lignite coal to a point below the gross cost chargeable to that coal traffic, and would have been insufficient to have raised the Soo return from the traffic to the place now occupied by the Northern Pacific in such respect; so that all the difference in fact would have been that both Soo and Northern Pacific would be then hauling this freight at less than the gross cost, including, of course, out-of-pocket and all fixed charges. We, therefore, in this opinion, treat the rate fixed by the agreement between the carriers as though the same had been fixed by the board of railroad commissioners. The legal consequences in either case would be the same, so far as the review in this case is concerned.

We are led to here remark the fact of the legislative rate being a declaration of the sovereign power of this state on a matter of public policy. Importance must be given to the situation as disclosed by the facts, of which the court will take judicial notice, and concerning which legislation in the public interests and founded upon public policy has been as here declared. The central and western portion of this state is underlaid with lignite coal beds, the mining of which for fuel is as profitable as a mining enterprise as it is an economic advantage to the consumers, who must in this climate use coal six months out of the year. Thus, necessity creates an industry and a market. It would seem that the development of both must redound to the benefit of the common carriers, here as ever the connecting link between the producer and the consumer. It is easy to see that the strangulation of the mining and distribution of this coal, or the confining of it by exorbitant freight rates to as limited an area, and therefore as small a market, as possible, must temporarily operate to the great advantage of the common carriers, and against the public welfare of the people of this

state proportionately, inasmuch as those who cannot burn lignite fuel must, on these prairies, otherwise devoid of fuel, buy the eastern coal, which has increased in cost from 100 to 200 per cent between the mines in Pennsylvania and the point of its distribution to the consumer, half of which undoubtedly arises from freight charges, as in this instance, as always, the old adage proves true, that "the consumer pays the freight." As against the incentive for avarice of those benefited by freight rates, and urging in this review of this commodity rate the right to dividends from the earnings of every commodity carried, the legislature in its wisdom, exercised in the interest of sound public policy, has fixed by statute the maximum rate, and the statute must be looked upon as the legislative expression of a public policy intended to encourage industry and commerce and promote the general well-being and public good under the obvious benefits arising therefrom. It may be that to a greater or lesser extent public policy enters into the fixing of every rate statute or rate regulation, but it would seem to be here present to an unusual degree. Of course, questions of public policy may enter into every statute in the same sense as here present, and may be assumed as the reason for interference with state fixed rates only where the clearest proof makes it necessary to protect private constitutional rights from state infringement. But no harm can come from in passing remarking its presence here.

### Rate Law as Involved.

The facts are somewhat involved, but the application of the law may be made under the following subdivisions leading to the determination of the issue:

(1) Where the intrastate freight rate to be reviewed is a statutory one upon a single commodity, assuming such a rate may be under certain circumstances confiscatory, when is the burden of proof met, and what degree of proof is requisite to establish the rate to be confiscatory?

(2) Whether such a rate can ever be confiscatory where the freight returns under it yield more than the out-of-pocket costs of transportation of the commodity, even though said returns are insufficient to also fully reimburse that proportion of the railroad's fixed or overhead

costs properly apportionable to such commodity. In other words, is a noncompensatory rate confiscation in law?

(3) Assuming that such a commodity rate under certain circumstances may be held confiscatory in law, is the rate attacked shown to be confiscatory? In this question is involved both the method and the measure of proof of confiscation.

(4) The rules by which the operation of the statute is measured as to whether the same is confiscatory, in turn, involve, (a) valuation of railroad property used in producing the revenue received under the rate; (b) proof that such returns under the rate predicated upon the valuation of property used to earn the same are insufficient to amount to a fair rate of interest upon such valuation; and (c) finally, though the rate may yield an inadequate percentage of return on the value of the property utilized in earning the same, to prove the rate confiscatory, it must further appear that the effect of such loss on the commodity rate is to render the total intrastate net earnings from all intrastate freight inadequate to yield a reasonable interest rate on the fair value of all its property employed in producing such total earnings.

(1) Burden and Degree of Proof. We first determine the rules of law governing the attitude of the court toward the rate attacked; where the burden of proof rests; and the degree of proof necessary before a rate can be established as unconstitutional because confiscatory. As to the governing principles the law is clear, and we can find it nowhere better stated than in the very recent decision of Louisville & N. R. Co. v. Railroad Commission, reported in 208 Fed. 35, in the following language: "In deciding the question whether or not an order made by authority of the state, fixing rates, is confiscatory, the inferior courts, as to the measure of proof, are guided by well-settled rules binding on them because announced by the Supreme Court. One of those rules is that the rate fixed by legislative authority is prima facie fair and just. . . . The presumption must be indulged at the outset that it is reasonable, and not violative of constitutional rights. The burden of proof is placed on the plaintiff [railroad] to show that the case is one calling for judicial interference with the authorized action of the local authorities. Railroad Commission v. Cumberland Teleph. & Teleg. Co. 212 U. S. 414, 53 L. ed. 577, 29 Sup. Ct. Rep. 357;

Minneapolis & St. L. R. Co. v. Minnesota, 186 U. S. 257–264, 46 L. ed. 1151–1156, 22 Sup. Ct. Rep. 900. Another rule for our guidance is that the burden of proof is not only placed on the plaintiff, but that the plaintiff is required to do more than offer a mere preponderance of evidence. The judiciary is not permitted to interfere with the rates established by legislative authority, unless it is made to appear clearly and beyond reasonable doubt that they are unreasonable, and that their enforcement would be equivalent to the taking of property for public use without just compensation. If the evidence offered leaves the .court in doubt, if it is not clear, satisfactory, and convincing, the rate fixed by state authority should not be enjoined. San Diego Land & Town Co. v. National City, 174 U. S. 739–754, 43 L. ed. 1154–1160, 19 Sup. Ct. Rep. 804; St. Louis & S. F. R. Co. v. Gill, 156 U. S. 649–667, 39 L. ed. 567–573, 15 Sup. Ct. Rep. 484. So stringent are these rules against interference with the action of the local authorities in fixing rates, that it has been said that the court should not enjoin a rate unless it can hold 'that it was impossible for a fair-minded board to come to the result which was reached' [in establishing the rate]. Knoxville v. Knoxville Water Co. 212 U. S. 1–17, 53 L. ed. 371–382, 29 Sup. Ct. Rep. 148–153. These rules are not merely cautionary phrases; they are intended to mark the limits of judicial interference." Nothing can be added to this plain but comprehensive statement.

(2) Is a Noncompensatory Rate Confiscation. The legislative rate attacked has returned to the railroad more than the outlay for transportation expenses or out-of-pocket costs occasioned in the freightage of the commodity, by some 20 or 30 per cent, which excess, of course, has contributed toward the payment of the railroad's fixed or overhead charges, which would have been the same whether or not such commodity had been carried. By actual transportation or out-of-pocket costs, we refer, then, to those items only of railroad expense caused solely in the carriage of lignite freight, and which costs consume approximately 60 per cent of the revenue so produced under the legislative rate; and distinguish and differentiate such expense from that large additional proportion of railroad expense which must necessarily accrue regardless of the carriage of any particular freight commodity, and toward the payment of which fixed and practically invariable expense 20 to 30 per cent of the gross earnings from the carriage of this

coal have contributed, over and above and after the reimbursement to the railroad of its transportation or out-of-pocket costs. Under such a situation can the courts conclude, as a matter of law, that the legislative rate is confiscatory and violative of Federal constitutional rights so guaranteed the carrier? We answer in the negative. To hold otherwise would be analogous in principle to declaring that a carrier has a vested right to earn a net profit over every mile, section, or division of its road, or upon every commodity or article of commerce carried by it. See the cases cited in our former opinion, particularly St. Louis & S. F. R. Co. v. Gill, 156 U. S. 649, 39 L. ed. 567, 15 Sup. Ct. Rep. 484; Minneapolis & St. L. R. Co. v. Minnesota, 186 U. S. 257, 46 L. ed. 1151, 22 Sup. Ct. Rep. 900; Atlanta Coast Line R. Co. v. North Carolina Corp. Commission, 206 U. S. 1, 51 L. ed. 933, 27 Sup. Ct. Rep. 585, 11 Ann. Cas. 398, a case closely parallel to the one before us. There the duly constituted state authority ordered the doing of a particular act, the running of a daily train by the railroad at a loss. It was held not to invoke "the question of the profitableness of the operation of the railroad as an entirety." Likewise, the carriage, under compulsion of legislative enactment, of a single commodity among the many constituting the wholly intrastate freight traffic, at least unless of great proportionate volume as to the total intrastate traffic, should not be held to involve the "profitableness of the operation of the railroad as an entirety." If a railroad has no constitutional right that a portion of its road, less than its total system within the state, shall yield revenue over all disbursements in operation, interest on bonded indebtedness, and taxes, as against state regulation of domestic freight rates of such state, still less in principle would it have the right, as against a legislative rate, to insist upon the return to it of a gross revenue, or a return upon affreightment of one commodity more than sufficient to pay for the transportation of such commodity and in addition a fair contribution toward general overhead expense that might be in reason apportioned to its carriage. Granting that the general rule may be that a railroad must be conceded the right to exact for its service a rate that will yield returns over gross expenses, it does not follow that each commodity rate must be so fixed, without regard to the service rendered or the freight classification as to risk, desirability, or ease of handling. In determining the rea-

sonableness of this commodity rate, our finding of fact that it is much in excess of actual transportation charges, that is, out-of-pocket costs, determines, as a matter of law, that the rate is not unreasonable, or a deprivation of any rights guaranteed these defendants under the 14th Amendment to the Federal Constitution.

(3 and 4) Method and Measure of Proof of Confiscation.   But coming now to the third and fourth subdivision of this discussion, and assuming that proof establishing that a rate on a single commodity as fixed by legislative enactment, because of volume of the traffic in that commodity, and under proper proof, may amount to confiscation of the property of the carrier, there is nothing in the record in this case from which such a conclusion can be reached.   Assume that when we find the fact to be that this commodity has not paid its full proportion of the overhead and fixed railroad charges assignable to it, even though it does bring a return greater than the actual out-of-pocket costs of carriage, that we must thereby conclude in law that the commodity is carried at a loss to the carrier, so that such fact may be a basis upon which confiscation can be predicated, still this alone is far from establishing that in law the statutory rate is shown to be confiscatory and void as an infringement of constitutional property rights.   To stop here would be to assume a result that must not only be proven by evidence, but established so clearly and convincingly as to leave no reasonable or substantial doubt as to the effect of the rate upon the whole earnings, of which it is but a part, when compared with and measured by the value of the property used in producing the earnings accruing from the commodity rate.   In other words, until the railroad has established by proof the existence of a general deficiency in intrastate earnings, or that the same will not pay a reasonable return upon the value of the railroad property used in producing such total intrastate return, it has not established its case, although it has shown a loss to ensue in the carriage of a certain commodity at a maximum statutory rate.   Or, as is well said in the special concurring opinion of Judge Grubb in Louisville & N. R. Co. v. Railroad Commission, 208 Fed. 35, at page 52, concerning the effect of an intrastate reduction in passenger rates from 3 to $2\frac{1}{2}$ cents:  "The plaintiff must also reasonably satisfy the court of the second proposition, that any deficiency in intrastate earnings below the point of remuneration that may exist is substantially

contributed to by the enforcement of the reduced passenger rate. That rate cannot be said to be so unreasonably low to be confiscatory, unless its operation is attended with that result. Even though the intrastate earnings have reached the unremunerative point, it does not follow that every rate reduction thereafter is an act of confiscation. It is conceivable that the reduction of a specific rate may be inconsequential in its effect on the entire intrastate business, or at least of not sufficient consequence to constitute confiscation; or that, by increasing the amount of business done at the lower rate, it may be attended with no loss of earnings or even with an increase. In such a case the fact that the entire intrastate earnings of a carrier did not, either before or after the reduction, yield a fair return, would not condemn the reduced rate." And in the main opinion, on page 40, we find the following: "The great volume of evidence submitted relates to the issue necessarily involved in the main case, as to whether or not the railroad was earning, under the general schedule of rates then in question, a fair return on the value of its property devoted to intrastate public service. The solution of that question in favor of the plaintiff would not be conclusive against the defendants in the instant case, because it is limited to intrastate passenger rates. It might be true that the plaintiff would fail to secure an adequate return on all of its property devoted to the public intrastate service, and yet the failure might not be due to the passenger rate. If the return were insufficient on the whole property, the passenger rate would not be made invalid unless it materially contributed to cause the insufficiency. It follows that, to attack the order successfully, the insufficiency of the return must be shown and also that the order as to passenger rates is at fault in causing the insufficiency. If the insufficiency of the return were proved according to rules hereinafter stated, if it appears that such insufficiency is caused by the policy of the plaintiff in operation and investment, and not by the rates attacked, the rule of adequate return would be inapplicable. The plaintiff cannot be permitted to cause the failure of return by its own acts and then complain of it. . . . Under the circumstances we would be reluctant to hold that the order fixing a passenger rate only is confiscatory, because the plaintiff fails, if it does fail, to receive an adequate return on all of its property devoted to intrastate public service." Citing Minneapolis & St. L. R. Co. v. Minnesota, 185 U. S.

257, 46 L. ed. 1151, 22 Sup. Ct. Rep. 900; Reagan v. Farmers' Loan & T. Co. 154 U. S. 362–412, 38 L. ed. 1014–1028, 14 Sup. Ct. Rep. 1047; Covington & L. Turnp. Road Co. v. Sandford, 164 U. S. 578–596, 41 L. ed. 560–566, 17 Sup. Ct. Rep. 198; San Diego Land & Town Co. v. Jasper, 189 U. S. 439–447, 47 L. ed. 892–896, 23 Sup. Ct. Rep. 571; and Re Advances in Rates by Carriers in Western Trunk Line, 20 Inters. Com. Rep. 342. And the proposition is but conversely stated in Interstate Commerce Commission v. Union P. R. Co. 222 U. S. 541, 548, 56 L. ed. 308, at page 312, 32 Sup. Ct. Rep. 108, where the court, in discussing a rate fixed by the Interstate Commerce Commission governing the haulage of lumber from the coast to St. Paul and Omaha, has the following to say concerning this question as to one commodity: "Where the rates as a whole are under consideration, there is a possibility of deciding with more or less certainty whether the total earnings afford a reasonable return. But whether the carrier earned dividends or not sheds little light on the question as to whether the rate on a particular article is reasonable. For if the carrier's total income enables it to declare a dividend, that would not justify an order requiring it to haul one class of goods for nothing or for less than a reasonable rate. On the other hand, if the carrier earned no dividend, it would not have warranted an order fixing an unreasonably high rate on such article." In Atlantic Coast Line R. Co. v. North Carolina Corp. Commission, 206 U. S. 1, 51 L. ed. 933, 27 Sup. Ct. Rep. 585, 11 Ann. Cas. 398, concerning the effect of the state commissioner's order that a daily train be operated, the proof showing it to be at a loss to the company, and in such respect analogous to the assumed facts under discussion, it is said, on page 25, or at 51 L. ed. page 944: "But even if the rule applicable to an entire rate scheme were to be here applied, as the findings made below as to the net earnings constrain us to conclude that adequate remuneration would result from the general operation of the rates in force, even allowing for any loss occasioned by the running of the extra train in question, it follows that the order would not be unreasonable, even if tested by the doctrine announced in Smith v. Ames, 169 U. S. 540, 42 L. ed. 847, 18 Sup. Ct. Rep. 418, and kindred cases." Besides declaring the law applicable to the determination of the question of confiscation as to a single act, or by analogy a single commodity rate, as necessitating

proof of other earnings than those resulting from the rate in order to determine anything at all, the court here construes Smith v. Ames, around which the defendants have builded their briefs in this case. It is therefore doubly applicable. We still adhere to the former decision of this court reported in 19 N. D. 45, 25 L.R.A.(N.S.) 1001, 120 N. W. 869, in which the rule is announced that "the proper test as to whether the rates thus fixed are reasonable or unreasonable is not whether the rate fixed on the particular commodity is sufficiently high to enable the carrier to earn a fair compensation after allowing for the legitimate cost to the carrier of transporting the same, but whether under such rates it will be enabled from its total freight receipts on all its intrastate traffic to earn a sum above operating expenses, reasonably neces- sary for such traffic, sufficient to yield a fair and reasonable profit upon its investment." The rule seems to be supported by the authorities there cited, among which are Interstate Commerce Commission v. Louisville & N. R. Co. (C. C.) 118 Fed. 613; St. Louis & S. F. R. Co. v. Gill, 156 U. S. 649, 39 L. ed. 567, 15 Sup. Ct. Rep. 484, affirming the same case in 54 Ark. 101, 11 L.R.A. 452, 15 S. W. 18; State ex rel. Railroad & W. Commission v. Minneapolis & St. L. R. Co. 80 Minn. 191, 89 Am. St. Rep. 514, 83 N. W. 60; Minneapolis & St. L. R. Co. v. Minnesota, 186 U. S. 257, 46 L. ed. 1151, 22 Sup. Ct. Rep. 900; State ex rel. Ellis v. Atlantic Coast Line R. Co. 48 Fla. 146, 37 So. 657, affirmed in 203 U. S. 256–261, 51 L. ed. 174, 175, 27 Sup. Ct. Rep. 108.

Conceding, however, that the findings concerning the Soo may serve as the basis of proof of confiscation, if it be further established that the company is not earning a reasonable return upon all of its intrastate business when measured by the amount of its investment, that is, the value of its property within this state necessary to the earning of the revenue received, the company must also establish, to sustain its contention that the rate is confiscatory, (a) the amount of its total net earnings or net loss on its intrastate business; and (b) if it has accumulated net earnings on such intrastate business, it follows that before it can be determined whether the same constitutes a fair income on its investment, it must establish the value of its property used to produce such earnings, and also if it has suffered a net loss on its intrastate traffic, or has made an insufficient profit, measured as above stated, it

must further clearly appear that the loss from the carriage of the commodity in question materially increased the loss or insufficient return beyond what it otherwise would have been. All these must appear from the proof, established directly or by reasonable inference, before the statutory rate presumed to be reasonable and just, and therefore valid, can be held invalid as an unconstitutional deprivation of property and a denial of the equal protection of the law. Besides being the logical requirements to reach the ultimate end, it seems that these rules are now fairly definitely established. And as to the accuracy of the determination of the value of the property, as well as its apportionment of expense applied to profits to determine earnings, strict legal proof of the facts is the requirement announced by the Minnesota, Missouri, and Oregon Rate Cases, 230 U. S. 352–560, 57 L. ed. 1511–1629, 48 L.R.A.(N.S.) 1151, 33 Sup. Ct. Rep. 729–1030, in the decision of which estimates of experts were not accepted as sufficient proof of facts, but the railroad was held to the requirement that it prove its case by clear and satisfactory evidence, or suffer dismissal of its bill of complaint, when it seeks to establish the invalidity of legislative rates. See also Wood v. Vandalia R. Co. 231 U. S. 1, 58 L. ed. —, 34 Sup. Ct. Rep. 7, in which the method of proof known as the revenue basis, but little more than an arbitrary apportionment, is expressly held insufficient in the following language: "It is plain, however, that it does not follow from the mere fact that the total operating expenses of a railroad, or of a division of a railroad, bear a given relation to the entire receipts of that road or division, that the cost of transportation in the case of a particular class of traffic bears the same relation to the revenue derived from that class. The ratio in the first case is found by bringing together a great variety of operations involving various rates and different outlays for different sorts of traffic. It is predicated of the whole volume of business considered as such, and may be far from true of some part of it considered separately. It does not purport to be an expression of the relative cost of any specified part, but simply of that of the entire traffic to which it applies." And this is equally true as to the method of proof of the cost of carriage of lignite coal offered by the Great Northern system as to cost of carriage of coal on its main and branch lines. The Soo line, on the method of proof, claims that the revenue method is supported by

the following authorities:  Re Arkansas Rate Cases, 163 Fed. 141; Missouri, K. & T. R. Co. v. Love, 177 Fed. 493; Love v. Atchison, T. & S. F. R. Co. 107 C. C. A. 403, 185 Fed. 321, at pages 328 and 330; and also Shepard v. Northern P. R. Co. 184 Fed. 765.  But the foregoing from Wood v. Vandalia R. Co., and the express disapproval of this method in the decision of the Minnesota Rate Cases, we take as the last word on the subject, and as the equivalent of establishing a failure of proof in this case as to the Soo and the Great Northern, in which the testimony in this record establishes the same method of proof here used was offered in the Minnesota Rate Cases.

As the fixing of the valuation of railroad property is a mixed question of law and fact, it can well be considered here.  Neither the Northern Pacific nor the Great Northern have offered any proof either as to total intrastate earnings, or as to the value of the railroad property employed in producing such earnings, both carriers assuming that it was unnecessary to make such proof, and that, should the court find that the gross revenue from this commodity failed to pay gross expenses apportionable for the carriage of this coal, it must, as matter of law, determine the legislative rate to be confiscatory.  We quote the following from the oral argument of Mr. Donnelly, taken at the trial: "What we desire to present clearly to this court, regarding the revenue derived from the handling of this particular commodity, is that the operating expenses absorb practically 98 per cent of the gross; that is, taking it on its most favorable basis.  This might be taken in regard to any railroad in the United States to indicate confiscatory rates, if confiscation means what we think it means, and that brings up the real legal question in the case.  If this court shall persevere in the doctrine laid down in the previous case, the contentions of the carriers will be rejected, because that doctrine is that it is within the right of the state to compel the Northern Pacific Railway Company to move this or that commodity from one point to another, even though it be shown that the company earns no revenue thereby.  Such is the contention which, as we think, is the very large question in issue here.  Taken from a view point most favorable to the contention of the state, it will be apparent that our operating expenses and taxes exhaust the revenue derived from this coal.  If that is the doctrine adhered to, it will be announced for the first time in this case, as it has been announced in

the previous decision. . . . We have approached the case in perfect fairness, and attempted to show clearly and fairly just what it costs us to haul this coal. The actual amount involved, of course, while it is large to me or any of us, is not so in connection with the receipts of the Northern Pacific. Of course, the Northern Pacific could be compelled to move this lignite coal for nothing without appreciably affecting its revenues; and we have not made a showing, and I concede we cannot, of confiscation independently of that. We cannot say the total sum we have earned is less as a result of this rate you have told us to put into effect. But we do say we have a right to demand that each commodity moved must contribute its proportion to the earnings over and above the expense of operation." This is the summary of the Northern Pacific Case, made on oral argument by its able counsel. We might perhaps have taken counsel at his word and refused to make findings as to the cost of carriage of this commodity under the maximum statutory rate, for the reason that, conceding the facts to be as so contended, the rate is not shown to be confiscatory, the value of the property employed to produce earnings, if any were made, not being shown, and on the further grounds that the court cannot assume that the carriage of this commodity materially affected dividends or earnings of the carrier. And under the concession of counsel that the carriage of this commodity could be compelled "for nothing without appreciably affecting its revenues," and again, "we cannot say the total sum we have earned is less because of this rate you have told us to put in effect," we could conclude, as a matter of law, that the rate cannot be found confiscatory as to the Northern Pacific. In order, however, that the Federal Supreme Court, assuming that this case will reach that court of last resort, may be enabled to avoid some of the labor of exploring this entire record, and that the defendants may feel that consideration has been given in this court to these cases commensurate with their importance, and also that any benefits of proof made by one carrier may be considered in its bearing upon the proof as to others, in accordance with the stipulation of counsel virtually consolidating the cases, we have made full findings of fact as to the Northern Pacific proof, although that road in our opinion has utterly failed on its proof. And as the Great Northern has likewise stood upon the proposition that it was unnecessary to make proof of value of its properties,

or apportion such value, or make proof of intrastate earnings, what is said as to the Northern Pacific is equally applicable to it.

"What the company is entitled to ask is a fair return upon the value of that which it employs for the public convenience. On the other hand, what the public is entitled to demand is that no more be exacted from it for the use of a public highway than the services rendered by it are reasonably worth." Smith v. Ames, 169 U. S. 546, 42 L. ed. 849, 18 Sup. Ct. Rep. 418; quoted with approval in the Minnesota Rate Cases (Simpson v. Shepard) 230 U. S. 352, at page 435, 57 L. ed. 1511, 1556, 48 L.R.A.(N.S.) 1151, 33 Sup. Ct. Rep. 729, where the foregoing is supplemented by the following rule, where intrastate rates are under examination: "Where the business of the carrier is both interstate and intrastate, the question whether a scheme of maximum rates fixed by the state for intrastate transportation affords a fair return must be determined by considering separately the value of the property employed in the intrastate business and the compensation allowed in that business under the rates prescribed," as was also held in Smith v. Ames, supra. And again the court there says: "The necessity of this segregation of the domestic business in determining values and results of operation was recognized by both parties." And again in the same case, at 230 U. S. 426, the rule is declared to be that "the reasonableness of intrastate rates was to be determined by considering the intrastate business separately." See also Ames v. Union P. R. Co. 64 Fed. 165, an opinion by Brewer, J. This is again followed in one of the Oregon Rate Cases, Southern P. Co. v. Campbell, 230 U. S. 537, as appears from pages 549, 550, 57 L. ed. 1610, 1623, 1624, 33 Sup. Ct. Rep. 1027, where it is said: "In addition to this omission, the bill was destitute of any allegation showing the expenses incurred in the conduct of the intrastate business as distinguished from the interstate business, or the share of the value of the property which was assignable to the former. In short, the allegations of the bill were wholly insufficient to show that the complainants would be deprived of just compensation in their business of intrastate transportation by virtue of the operation of the order." Opportunity was given in the court below to amend and cure such defects in the complaint, and on failure to do so a demurrer thereto was sustained, concerning which the Supreme Court says: "But the

complainants informed the courts that they did not desire to avail them-
selves of this opportunity, and accordingly the bill was dismissed.
We think that it cannot be said that any error was committed in
thus disposing of the contention as to confiscation." This seems to
be the last word of the United States Supreme Court upon this sub-
ject, to the effect that without proof of the fair value of the property
devoted to intrastate traffic, there is an utter and absolute failure of
proof. This alone would seem decisive of the Northern Pacific and
Great Northern Cases.

The Soo, however, have offered evidence touching some of these
issues. See Soo Exhibit 36, and testimony of witness Kolk, ex-
planatory thereof, found in the direct examination at page 146, and
the further examination of the witness thereon under succeeding pages
to page 162 of the record. Concerning Exhibit 36 the witness testi-
fies that it "shows what would be the cost of reproducing the Soo
line and properties in this state at this time" in his judgment, and
that such cost would amount to $30,047,798. But on cross-examination
the witness shows that the sources of his knowledge are mere tabula-
tions containing items for right of way, station grounds, and clearing,
grubbing, and grading, organization, interest during construction, and
contingencies, engineering, superintendence, and legal expenses, charges
for which mentioned items alone amount to $15,000,000, or one half
of the claimed total value of $30,000,000. All these items enumerated
are based upon arbitraries or estimates, or upon the railroad value
rather than the actual value.

This is made plain on page 152 of the record, where its witness,
testifying as to the value of approximately 16,000 acres of right of way,
fixed at $100 per acre, and amounting to over one and one-half million
dollars, says:

Q. Then your estimate of $100 per acre is on a basis of an esti-
mated *railroad value* of four times the normal value, is that right?

A. Yes, sir. It is based on this: That in acquiring land for a
railroad company, you take a strip of land which does not necessarily
follow the government subdivisions; it cuts land diagonally. Fre-
quently it runs into buildings. All these enter into the value that
the railroad company has to pay as damages to the adjoining property.

That is, the acre value of the right of way is above the normal value, for the reason that it damages the adjacent property. It is impossible, in other words, to procure a railroad right of way at the normal value of land.

The actual, reasonable, market value of railroad property is the basis upon which to determine the percentage of returns yielded by net revenues. Proof of market value is not made by proof of railroad value. The Minnesota and other rate cases in 230 U. S. settle this beyond question. See pages 454–456 of that volume, summed up in the following statement: "Assuming that the company is entitled to a reasonable share in the general prosperity of the communities which it serves, and thus to attribute to its property an increase in value, still the increase so allowed, apart from any improvements it may make, cannot properly extend beyond the fair average of the normal market value of land in the vicinity having a similar character. Otherwise we enter the realm of mere conjecture." And again: "And where the inquiry is as to the fair value of the property, in order to determine the reasonableness of the return allowed by the rate-making power, it is not admissible to attribute to the property owned by the carriers a speculative increment of value over the amount invested in it, and beyond the value of similar property owned by others, solely by reason of the fact that it is used in the public service. That would be to disregard the essential conditions of the public use, and to make the public use destructive of the public right. . . . We therefore hold that it was error to base the estimates of value of the right of way, yards, and terminals upon the so-called 'railroad value' of the property." Also the following excerpt applies particularly to plaintiff's offered proof of valuation of its North Dakota properties, shown by Soo Exhibit 36: "The allowance made below for a conjectural cost of acquisition and consequential damages must be disapproved. And in this view we also think it was error to add to the amount taken as the present value of the lands the further sums calculated on that value which were embraced in the items of 'engineering, superintendence, legal expenses,' 'contingencies,' and 'interest during construction.'" Exhibit 36 contains about four mil-

26 N. D.—32.

lions in items for engineering, superintendence, legal expenses, contingencies, and interest during construction, all based upon percentages.

But assume that this carrier defendant has some proof in the record from which the value of its North Dakota properties devoted to railroad business may be ascertained. There is no apportionment of that value between interstate and intrastate business, which is equally essential in order that the confiscatory nature of the rate may be determined. We may assume that the company has made proof of the value of its road to be $30,000,000. Any attempted apportionment on gross earnings is insufficient under the Minnesota Rate Cases (Simpson v. Shepard) 230 U. S. pages 458–461, 57 L. ed. 1565, 1566, 48 L.R.A.(N.S.) 1151, 33 Sup. Ct. Rep. 729. A gross earnings division, coupled with a comparison of the cost of intrastate and interstate traffic, as was done in the Missouri Rate Cases (Knott v. Chicago, B. & Q. R. Co.) 230 U. S. 474, and pages 504 to 507, 57 L. ed. 1571, 1593, 1594, 33 Sup. Ct. Rep. 975, does not meet the requirements. "It is evident that in an apportionment of expenses, either upon the revenue method or upon the ton mile and passenger mile method, relations may be assumed which do not in fact exist," and an apportionment so sought to be established is repudiated. Whether in fact any reasonably satisfactory and certain proof of such apportionment of values to traffic can be made seems doubtful, but the rule in this particular is to be declared by the court of last resort. It would seem, however, that before the Federal Supreme Court "have pricked out by the gradual approach and contact of decisions on the opposing sides" the rule to be observed in this apportionment (quoting from Noble State Bank v. Haskell, 219 U. S. 112, 55 L. ed. 117, 32 L.R.A.(N.S.) 1062, 31 Sup. Ct. Rep. 186, Ann. Cas. 1912A, 487, the Oklahoma guaranty of bank deposits case, wherein the above language is used concerning the definition of police power), that court of last resort will have a hard task in declaring a definite rule as to apportionment that will be harmonious with the usual rules of evidence, and square with the usual contingencies. In those exceptions where relief has been granted the carrier, as in the Minnesota Rate Cases, where relief was granted to the Minneapolis & St. L. R. Co., and in the Missouri Rate Cases, where granted to the three roads as exceptions (see 230 U. S. 507, 508), relief was granted upon general

conclusions drawn without stating specifically the facts that constituted the cases of these carriers as exceptional, and so afford no guidance as to the manner of arriving at an apportionment of value or the conclusions there reached. We do not say this in criticism, but rather to illustrate that these defendants and also inferior courts, in passing upon this question, must remain in the dark as to the proper method of apportionment until further decisions of the Federal Supreme Court furnish light on the subject.

In attempting to establish its contention that a legislative rate not yielding a sufficient revenue to return a fair profit must be held in law confiscatory, irrespective of whether the effect of the rate and the loss thereunder is to reduce the railroad earnings of a similar class to below the point of being remunerative in order to be confiscatory, counsel have urged the following in oral argument: "It is perfectly obvious that if the state can say to the Northern Pacific 'you must move coal at a loss,' it can do the same as to wheat. The attorney general says a point would be reached when it could not do so; and that such point is reached when the railroads can come in and show that the rates are so low they are not making a reasonable profit on their entire business. But we must consider this element: When North Dakota is saying this as to lignite coal, Montana may be saying it as to her ore, and Idaho and Washington as to their lumber. Each state can go on until that point is reached, and then what rate is confiscatory? Is it the North Dakota coal rate or the Washington lumber rate? It is but necessary to carry this argument to its logical end in order to see the difficulties which would arise from such a construction." The argument is plausible, and would seem to have force, but it has been urged before in the court of last resort in a similar case, or at least where the effect would have been the same. We refer to Atlantic Coast Line R. Co. v. North Carolina Corp. Commission, 206 U. S. 1, 23, 51 L. ed. 933, at page 944, 27 Sup. Ct. Rep. 585, 11 Ann. Cas. 398, wherein the same in principle was contended, as shown from the following quotation: "It is insisted that, although the case be not controlled by the doctrine of Smith v. Ames, nevertheless the arbitrary and unreasonable character of the order results from the fact that to execute it would require the operation of a train at a loss, even if the result of the loss so occasioned would not have the effect of reducing the aggregate net earnings below a reason-

able profit. The power to fix rates, it is urged, in the nature of things, is restricted to providing for a reasonable and just rate, and not to compelling the performance of a service for such a rate as would mean the sustaining of an actual loss in doing a particular service. To hold to the contrary, it is argued, would be to admit that a regulation might extend to directing the rendering of a service gratuitously, or the performance of first one service and then another and still another at a loss, which could be continued in favor of selected interests until the point was reached where, by compliance with the last of such multiplied orders, the sum total of the revenues of a railroad would be reduced below the point of producing a reasonable and adequate return. But these extreme suggestions have no relation to the case in hand." The court indicates that the point might be reached when such rates would fall under the attack here made, and so be subject to review in the Federal courts, but, as there said, such is not the issue upon which our judgment is invoked. But it would seem that under the facts assumed by counsel, the carrier may be without a remedy in the Federal courts under the Minnesota and other recent rate case holdings. But, as there intimated, the subject is one within the power of Congress to regulate as indirectly affecting commerce between the several states, assuming that the state regulations rendered the intrastate business of the various states unprofitable to the carrier, or otherwise created state-favored commodity classes amounting to discrimination against intrastate traffic. However, "sufficient unto the day is the evil thereof," and the hypothetical obstacles interposed by counsel in argument will doubtless be surmounted when necessary of determination, and. presented to the proper tribunal to declare the solution.

Should this court hold that the Soo carrier has offered competent evidence to establish the value of its property, and under the data before us attempt to apportion such value between intrastate and interstate use, to determine rate of earnings made in carriage of intrastate freight, and thereunder should grant relief to this carrier on the theory that the rate was confiscatory and unconstitutional as applied to it, on appeal the result would undoubtedly be the same as in the Arkansas Rate Cases, considered elaborately by the circuit court as reported in 187 Fed. 290, and reversed and dismissed on appeal in 230 U. S. 553, 57 L. ed. 1625, 33 Sup. Ct. Rep. 1030. A comparison of the tables con-

tained in Exhibit A, 187 Fed. 349–354, shows a much similar method pursued by that court in arriving at its determination that the rate was confiscatory to that here presented by these carriers, and which methods were on appeal held insufficient to establish a case of confiscatory rates.

We conclude there is a failure of proof as to all these carriers. The rate in operation does not affect alike any two of the three carriers. It is as to the Great Northern compensatory, and a reasonable rate; as to the Northern Pacific sufficient to more than reimburse for all expenses chargeable against the lignite traffic, but yielding so little revenue over such total expense as not to be remunerative in fact; and as to the Soo line, because of the effect of the prorating requirement of the statute, the lignite traffic does not yield to it a return sufficient to pay all costs attributable to lignite carriage, but does return to it an amount some 20 or 30 per cent more than sufficient to pay its out-of-pocket costs of transportation of said commodity. The Great Northern could not on the facts establish the rate to be confiscatory; as to its effect upon the Soo carrier no sufficient proof has been made of the value of its railroad property within this state; and as to the Northern Pacific no attempt has been made to make such necessary proof. Though the Soo has offered evidence upon the value of its North Dakota properties devoted to the railroad use, it has not established by competent evidence, measured by the rule in the rate cases reported in 230 U. S. 352–560, 57 L. ed. 1511–1629, 48 L.R.A.(N.S.) 1151, 33 Sup. Ct. Rep. 729–1030, the value of its railroad property reasonably apportionable as employed in earning its intrastate revenues, from which, as classified and apportioned, deductions are possible as to whether the particular rate attacked is confiscatory.

Though on the trial and in this opinion all three cases have been treated as consolidated by stipulation, in awarding relief each case will be considered separately. Let the writs heretofore issued from this court, entitled in each case, directed to each defendant as prayed for, restraining each several defendant from putting in force or restoring freight tariffs of the class covered by the statutory rate which shall exceed the maximum rate prescribed in chap. 51 of the Session Laws of 1907; and also enjoining collection of a greater freight return for haulage of lignite coal than is provided in said statutory rate as the maximum to be collected therefor, be each and all continued in force. The

state will recover judgment, to be entered by the clerk of this court, for its taxable costs and disbursements prorated between the defendant companies, one third of the total to be severally entered as a judgment against each company defendant. Judgment will be entered accordingly.

SPALDING, Ch. J. (concurring). The foregoing opinion follows as closely as possible the recent decisions of the Supreme Court of the United States in cases relating to railroad rates. The decisions of that court must, of course, control those of this body in actions of this nature, when the questions or principles are the same.

While the Supreme Court has laid down no very tangible rules as methods of proving valuation, operating expenses, etc., it seems by a process of elimination to have disapproved the methods of proof adopted by the railroads in the case at bar.

About the nearest approach I can see to its stating a rule for valuation is found in the recent Minnesota Rate Cases, wherein it is said that, "for purposes of establishing rates, the valuation apart from any improvements it may make, cannot properly extend beyond the fair average of the normal market value of land in the vicinity having a similar character," and other remarks indicating, as said by Judge Goss in expressing the views of this court, that "the actual reasonable market value of railroad property is the basis upon which to determine the percentage of returns yielded by net revenues." It would seem to me that the reasonable market value of a trunk line of railroad is about as indefinite a basis from a practical standpoint as can be imagined. The history of the last twenty-five years would appear to indicate that railway properties have no value when placed upon the market, in any degree commensurate, either with their fair and honest cost, or their earning capacity, or the value of their stocks and bonds on the market.

If the cost of replacement of the road and equipment is a proper criterion, how can it be replaced, without providing for superintendence, surveying, engineering, and the other preliminary expenses, which are as essential and necessary elements in the construction of a road as are the materials for bridges or station buildings?

It is possible that the great court which passed upon these questions only intended its disapproval of proof of the nature offered by the roads,

to go to the extent of rejecting their method of reaching the cost of these elements in replacing transportation lines, because seemingly based upon an arbitrary percentage and without an attempt to show what the actual cost would approximate. The same may be said with reference to the damages which necessarily must be paid to property owners whose property is taken or injured. The observation of every intelligent man conversant with railroad building in a part of the country where lines of many roads are being constantly extended can only lead to the conclusion that, in practice, railways are compelled, either by voluntary payment or through the medium of the courts, to pay far more for the acreage composing the right of way, and the damages to property occasioned by constructing the lines, than private individuals would have to pay for the same items for other purposes; but, if the railroads are to be constructed or extended, these are elements which someone must pay for, and if the roads are not to be allowed to charge a rate which will furnish a reasonable return on the amount invested for these purposes, I am not quite clear as to who will be found willing to advance the sums to be expended for these items, and which are expenses which must be incurred before the road can be operated or even constructed.

I am constrained to state my impression from a consideration of the authorities and the evidence submitted in the several cases, that the state of the law at this writing is such as to render it a practical impossibility for a common carrier to establish the facts necessary to its protection against confiscation through the medium of confiscatory rates. This applies as well to methods of distributing the receipts and expenditures between interstate and intrastate traffic, as to the proof of value of the plant. The methods of proof adopted by the roads in the instant cases were the same employed in several of the cases to which reference has been made in the main opinion herein, the most recent of such cases, however, not having been decided until after the proof was taken in the cases at bar, hence, the railroads find themselves provided only with proof which has met the condemnation of the Supreme Court of the United States, and which therefore must be held inadequate by this court.